UNITED STATES of America, Plaintiff,

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al.,** Defendants.

**In re APPLICATION XII BY THE INDEPENDENT ADMINISTRATOR.**

**No. 88 CIV. 4486 (DNE).**

United States District Court, S.D. New York.

Aug. 27, 1990.

Charles M. Carberry, Investigations Officer, New York City (Robert W. Gaffey, of counsel), Otto G. Obermaier, U.S. Atty., S.D.N.Y., Edward T. Ferguson, III, Asst. U.S. Atty., for U.S.

Stilman, Fridman & Shaw, New York City (Edward M. Shaw, Patrick J. Calihan, Edward J. Calihan, Arnold & Kadjan, Chicago, Ill., of counsel), for Dominic Senese, and Joseph Talerico.

## OPINION & ORDER

EDELSTEIN, District Judge:

This opinion arises out of the voluntary settlement in the action commenced by the plaintiffs United States of America (the "Government") against the defendants International Brotherhood of Teamsters (the "IBT") and the IBT's General Executive Board (the "GEB") embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). The remedial provisions in the Consent Decree provided for three Court-appointed officials, an Independent Administrator to oversee the remedial provisions, an Investigations Officer to bring charges against corrupt IBT members, and an Election Officer to oversee the electoral process leading up to and including the 1991 election for International Officers (collectively, the "Court Officers"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime through the election and prosecution provisions.

Application XII presents for this Court's review the July 12, 1990 Opinion of the Independent Administrator. The Independent Administrator held disciplinary hearings on charges filed by the Investigations Officer against three IBT officers, Dominic Senese, Joseph Talerico, and James Cozzo. The Independent Administrator concluded that the Investigations Officer had sustained his burden of establishing just cause for finding that the charges against Senese, Talerico, and Cozzo had been proved. The Independent Administrator imposed lifetime suspensions from the IBT on Senese, Talerico, and Cozzo. This Application followed.

### I. Background

Senese is the president of IBT Local 703, located in Chicago, Illinois. Senese was

charged with violating Article II, § 2(a) of the IBT constitution ("Article II, § 2(a)") by conducting himself in a manner that brought reproach upon the IBT. The Investigations Officer charged that Senese belonged to, and knowingly associated with members of La Cosa Nostra, including Joseph Aiuppa, John Cerone, and others, while an officer of the IBT.

Talerico is a business agent of Local 727, located in Chicago, Illinois. Talerico was charged with violating Article II, § 2(a) and Article XIX, § 6(b) of the IBT constitution ("Article XIX, § 6(b)") by (1) being adjudged in criminal contempt in violation of 18 U.S.C. § 401(3), and civil contempt for refusing to answer questions before a federal grand jury investigating the skimming of funds from a Las Vegas casino, while an officer of the IBT; and (2) knowingly associating from January 1, 1981 to the present, with Joseph Aiuppa and Philip Ponto, members of La Cosa Nostra, while an officer of the IBT.

Cozzo was executive coordinator of Local 786 in Chicago Illinois, but has not been employed by that local since July 9, 1989. Cozzo has also taken a withdrawal card and is not a member of that local. Cozzo was charged with violating Article II, § 2(a) and Article XIX, § 6(b) by being a member of La Cosa Nostra and knowingly associating with Joseph Lombardo, a member of La Cosa Nostra, while employed by Local 786.

Article II, § 2(a) is the IBT membership oath. That section provides in relevant part that every IBT member shall "conduct himself or herself in such a manner as not to bring reproach upon the Union ..." Article XIX, § 6(b) provides the bases for bringing disciplinary charges against IBT members. Article XIX, § 6(b)(1) indicates that violating any specific provision of the IBT constitution is chargeable conduct. Article XIX, § 6(b)(2) states that transgressing the IBT oath of office is chargeable conduct.

## II. Discussion

■ With respect to the disciplinary and investigatory provisions of the Consent De-

cree, the IBT General President and GEB delegated their disciplinary authority under the IBT constitution to the Court Officers. *United States v. International Brotherhood of Teamsters,* 905 F.2d 610, 618–19 (2d Cir.1990); *see also* November 2, 1989 Memorandum and Order, 725 F.Supp. 162, 169 (S.D.N.Y.1989); January 17, 1990 Memorandum and Order, 728 F.Supp. 1032, 1048–57 (S.D.N.Y.1990), *aff'd* 907 F.2d 277 (2d Cir.1990); *Local 27 v. Carberry et al.,* July 20, 1990 at 3–4, 1990 WL 108348 (S.D.N.Y.1990); *Joint Council 73 et al. v. Carberry et al.,* 741 F.Supp. 491, 492–93 (S.D.N.Y.1990). The Independent Administrator and Investigations Officer are stand-ins for the General President and GEB for the purpose of the instant disciplinary actions. Hearings before the Independent Administrator are conducted pursuant to the same standards applicable to labor arbitration hearings. Consent Decree, ¶ F.12.(A)(ii)(e).

■ Paragraph F.12.(C) of the Consent Decree mandates that the Independent Administrator must decide disciplinary hearings using a "just cause" standard. Consent Decree at 9. Paragraph K.16 provides that this Court shall review actions of the Independent Administrator using the "same standard of review applicable to review of final federal agency action under the Administrative Procedures Act." Consent Decree at 25. This Court may only overturn the findings of the Independent Administrator when it finds that they are, on the basis of all the evidence, "arbitrary or capricious." This Court and the Court of Appeals have interpreted ¶ K.16 to mean that decisions of the Independent Administrator "are entitled to great deference." 905 F.2d 610, 616 (2d Cir.1990) *see also* March 13, 1990 Opinion and Order, 743 F.Supp. 155, 160 (S.D.N.Y.1990).

Cozzo failed to respond to the charges filed by the Investigations Officer, did not appear for his disciplinary hearing, and does not challenge the decision of the Independent Administrator to this Court. Senese and Talerico argue the Independent Administrator's determination that the charges were sustained against them was "arbitrary and capricious." For reasons to

be discussed, the Independent Administrator's conclusions in the July 12, 1990 Opinion must be upheld in all respects.

### A. Facial Challenges to the Discipline Hearings

Senese and Talerico facially challenge several aspects of the procedure followed by the Court Officers to conduct their hearing. At the outset, Senese and Talerico contest the jurisdiction of the Independent Administrator to hear the charges against them. Senese and Talerico assert they were deprived of their rights under the United States Constitution. Senese and Talerico further argue that the Independent Administrator erred in allowing the introduction of, and then relying upon hearsay evidence.

### 1. Jurisdictional Challenge

■ Senese and Talerico first argue that the Independent Administrator has no jurisdiction to discipline them, since they were neither parties to the underlying litigation nor signatories to the Consent Decree. This argument is utterly without merit. It is beyond doubt that the disciplinary and investigatory provisions of the Consent Decree are binding on non-signatory members of the IBT. See United States v. International Brotherhood of Teamsters, 905 F.2d 610, 618–19 (2d Cir.1990); see also November 2, 1989 Memorandum and Order, 725 F.Supp. 162, 169 (S.D.N.Y.1989); January 17, 1990 Memorandum and Order, 728 F.Supp. 1032, 1048–57 (S.D.N.Y.1990), aff'd 907 F.2d 277 (2d Cir.1990); Local 27 v. Carberry et al., July 20, 1990 at 3–4 (S.D.N.Y.1990); Joint Council 73 et al. v. Carberry et al., 741 F.Supp. 491, 492–93 (S.D.N.Y.1990).

### 2. Constitutional Challenges

Senese and Talerico contend that the charges against them are violative of their rights under the First and Fifth Amendments to the United States Constitution. Senese and Talerico do not demonstrate that any Constitutional protection attaches to the conduct or their charges. As a result, the Independent Administrator's determination that these charges do not infringe Senese and Talerico's Constitutional rights must be upheld.

■ Senese and Talerico argue that these charges sanction them for associating with certain individuals, in violation of their First Amendment right of freedom of association. Senese and Talerico essentially ask this Court to rule that the IBT cannot punish members whose activities are adverse to the union's stated goal to be free of corruption, because they have a First Amendment right to associate with whomever they please.

Union members' First Amendment rights are statutorily curtailed by § 101(a)(2) of the Labor–Management Reporting and Disclosure Act, ("LMRDA"), 29 U.S.C. § 411(a)(2). Section 101(a)(2) specifically preserves for labor unions the right to "enforce reasonable rules as to the responsibility of every member toward the organization as an institution," and to sanction its members for conduct "that would interfere with its performance of its legal or contractual obligations." 29 U.S.C. § 411(a)(2).

It is the stated policy of the IBT to be free of the influence of organized crime. Consent Decree, fifth and sixth "WHEREAS" clauses. Union officers' associations with organized crime members pose a danger to the integrity of the IBT as an institution. United States v. Local 560, International Brotherhood of Teamsters, 581 F.Supp. 279, 315 (D.N.J.1984). It is beyond dispute that the IBT can sanction its own members who knowingly associate with organized crime figures, since such conduct violates "the responsibility of every member toward the institution" of § 101(a)(2) of the LMRDA.

The Independent Administrator noted that governments may lawfully impair an individual's freedom of association in a number of contexts. See, e.g., Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 125–133, 97 S.Ct. 2532, 2537–42, 53 L.Ed.2d 629 (1977) (Prison management outweighs prisoners' associative rights); Cordero v. Coughlin, 607 F.Supp. 9, 9–11 (S.D.N.Y.1984) (segregating AIDS prisoners); United States Civil Serv. Comm'n v. National Association of

*Letter Carriers, AFL–CIO,* 413 U.S. 548, 567, 93 S.Ct. 2880, 2891, 37 L.Ed.2d 796 (1973) (ban on political activity by federal employees); *United States v. Boyle,* 338 F.Supp. 1028, 1032–33 (D.C.Colo.1972) (ban on union political contributions). A state may strictly regulate which persons may serve in positions as officials in unions involved in gaming casinos. In *Brown v. Hotel and Restaurant Employees and Bartenders Int'l Union Local 54,* 468 U.S. 491, 509, 104 S.Ct. 3179, 3189–90, 82 L.Ed.2d 373 (1984), the Supreme Court held that the public has a compelling interest in eliminating the " 'public evils' of 'crime, corruption, and racketeering' " to justify such regulation on association. *Id.* While this situation involves sanctions imposed by a private actor, the IBT, the cited cases are further support for the Independent Administrator's conclusions.

The common denominator in all these cases is that the compelling state interest outweighs the associational infringement. If a state has a compelling interest in keeping private entities free of the influence of organized crime, then a private actor such as the IBT, which has a broad and universal impact on the commerce of the United States, surely has a compelling interest in ridding itself of the influence of organized crime. The Independent Administrator determined that the IBT has the right to discipline members for knowingly associating with organized crime figures since it has a compelling institutional interest in ridding itself of corruption. The IBT's sanctioning members in order to rid itself of corrupt influence conforms with § 101(a)(2) of the LMRDA, and infringes no First Amendment rights. *See Turner v. Air Transport Lodge 1948,* 590 F.2d 409, 412 (2d Cir.1978) (Mulligan J. concurring), *cert. denied,* 442 U.S. 919, 99 S.Ct. 2841, 61 L.Ed.2d 286 (1979).

Accordingly, the ruling of the Independent Administrator that these charges do not violate Senese and Talerico's First Amendment rights is not arbitrary or capricious, and must be upheld.

■ Senese and Talerico argue that current punishment for their past conduct violates their Fifth Amendment due process rights. They contend that at the time of the prohibited conduct they were not on notice that associating with certain individuals would subject them to union discipline. Senese and Talerico reason that prior to the signing of the Consent Decree, the IBT did not explicitly prohibit associating with organized crime figures. Senese and Talerico essentially argue that it is a due process violation for a labor union to step up its disciplinary enforcement after a period of laxity.

The factors relied upon by the Independent Administrator were sufficient to determine that these charges curtail no Fifth Amendment due process rights. First, the Consent Decree created no new standards of conduct for IBT members. Rather, the Consent Decree simply made explicit the longstanding goal of the IBT to be free of corruption. For example, it has been the written policy of the AFL–CIO—with which the IBT is affiliated—to be free of all corrupt influence. Second, an IBT officer plainly should know that associating with organized crime figures would violate his oath of office to not bring reproach upon the union. Indeed, this Court has held that "it defies logic to determine that [associating with organized crime figures] would not 'bring reproach upon the union.' " March 13, 1990 Order, *supra,* 743 F.Supp. at 164, *aff'd* 905 F.2d 610 (2d Cir.1990).[1]

Senese and Talerico were charged with breaching their sworn oaths not to bring reproach upon the IBT. By knowingly associating with organized crime figures, Se-

---

**1.** Additionally, the Independent Administrator noted that the Supreme Court has held that contemporary licensing schemes may take into account past behavior without denying an individual due process. *See De Veau v. Braisted,* 363 U.S. 144, 160, 80 S.Ct. 1146, 1154–55, 4 L.Ed.2d 1109 (1960). It is true that the *De Veau* decision and the resulting line of cases consider current enactments of public legislatures which take into account past activity, and are thus distinguishable from the disciplinary actions of a private actor such as the IBT. But this body of law does indicate that even under the more exacting standards applied to public laws, under proper circumstances current licensing schemes may consider and sanction past behavior.

nese and Talerico ignored their avowed duties as IBT officers to remain free of corrupt influence. The Independent Administrator found that Talerico and Senese as IBT officers knew or should have known that such conduct was a violation of their oath of office. It is true that the permanent injunction against associating with organized crime figures located at ¶ E.10 of the Consent Decree prospectively prohibits such associations. Yet, it in no way bars the imposition of sanctions for past conduct.

In sum, there is more than ample support for the finding that the charges against Senese and Talerico do not violate their due process rights under the Fifth Amendment. Thus, the findings of the Independent Administrator must be upheld.

### 3. Procedural Defects

■ Senese and Talerico next argue that the Investigations Officer further denied them due process of law under the Consent Decree by failing to provide them with all the evidence to be used against them 30 days in advance of their hearing, as they feel is required by ¶ F.12.(A)(ii)(b). In this regard, Senese and Talerico contend that the "Investigations Officer had no intention of allowing a fair hearing." (Senese Br., at 15).

But Senese and Talerico did not petition the Independent Administrator for the prehearing production of all evidence. Rather, they sought a bill of particulars and the issuance of subpoenas, requests that were rejected by the Independent Administrator. Senese and Talerico cannot point to an identifiable determination of the Independent Administrator to appeal now to this Court.

Further, the transcript of the hearing indicates that the Independent Administrator offered Senese and Talerico a seven-to ten-day adjournment to study further the evidence produced, and decide if they wanted to recall Special Agent Wacks. (Hearing transcript, at 183–93) This offer alone eliminated any possible prejudice to Senese and Talerico.

### 4. Admission of Evidence

Senese and Talerico vigorously contest the Independent Administrator's decision to allow the introduction of hearsay evidence at the disciplinary hearing. Senese and Talerico also argue that the Independent Administrator incorrectly determined that the hearsay evidence was reliable.

■ These arguments misconstrue the nature of the disciplinary hearings themselves, and the determinations of the Independent Administrator. Paragraph F.12.-(A)(ii)(e) of the Consent Decree stipulates that the Independent Administrator shall conduct disciplinary hearings "under the rules and procedures generally applicable to labor arbitration hearings." Consent Decree at 9. The Independent Administrator correctly determined that at a labor arbitration hearing, hearsay evidence is admissible if reliable. 6 Kheel, *Labor Law* § 24.04[3][f]; *see* Elkouri and Elkouri, *How Arbitration Works* 325–27 (1985). The proper inquiry by the Independent Administrator was to examine the reliability of the hearsay evidence. This Court's review is limited to assessing whether that determination of reliability by the Independent Administrator was arbitrary or capricious.

■ The primary evidence at the hearing against Senese was the testimony and affidavit of FBI Special Agent Wacks, and the affidavit of FBI Special Agent Parsons. Special Agent Wacks averred that the basis for his affidavit and testimony was (a) two FBI reports dated December 11, 1985 and April 10, 1986, compiled from information supplied to the FBI by former IBT General President Jackie Presser (Ex. IO–1A(K), Ex. IO–1A(L)); (b) Wacks' notes from his presence at an FBI debriefing of former IBT General President Roy Williams (Wacks Aff., ¶ 31, Ex. IO–1A(K)); (c) The deposition testimony of Cleveland La Cosa Nostra underboss Angelo Lonardo taken during the underlying litigation (Wacks Aff., ¶ 30, Ex. IO–1(K)); (d) the testimony of an unnamed cooperating witness (Tr., 194–20 to 195–15); and (e) physical surveillance by the FBI (Tr., 157–23 to 158–6, 162–21 to 163–1). The Independent Administrator also admitted Special Agent Wacks

as an expert on organized crime by the standards under Fed.R.Ev. 702.

Senese and Talerico argue that the Wacks affidavit and testimony was unreliable hearsay. They point out that two sources, Presser and Williams, are deceased, and unavailable for cross-examination. They offer that Lonardo and the unnamed cooperating witness were available and should have been called to testify at the hearing. Further, they claim the surveillance indicated that Wacks did not personally see Senese or Talerico associate with organized crime figures. As a result, they argue the hearsay in the Wacks affidavit and testimony renders that evidence not credible. Senese and Talerico do not challenge the Independent Administrator's decision to admit Wacks as an expert, or the reliability of the affidavit of Special Agent Parsons.

In making his determination that the Wacks affidavit and testimony were reliable, the Independent Administrator considered that Wacks' information was culled from multiple sources. Additionally, the various sources corroborated one another. The Independent Administrator cited the fact that Senese was identified as a member of La Cosa Nostra by Presser, Lonardo, and Williams. After hearing Wacks' oral testimony, the Independent Administrator found him to be a knowledgeable and trustworthy witness. Considering his multiple sources, their corroboration, and his demeanor, the Independent Administrator deemed Wacks a credible witness and his hearsay information reliable.

The Independent Administrator properly applied careful scrutiny to the Wacks affidavit and testimony before making his conclusion of reliability. As the trier of fact, the Independent Administrator was in the best position to judge the credibility and demeanor of Wacks as a witness, and the reliability of the information he offered. Considering the great deference to be given determinations of the Independent Administrator, his finding the information contained in the Wacks affidavit and testimony reliable hearsay was not arbitrary or capricious.

## B. The Sufficiency of the Evidence

The Independent Administrator determined that there was just cause to sustain a charge that Senese violated Article II, § 2(a) by knowingly associating with organized crime figures.

### 1. The Case Against Senese

■ Senese asserts the evidence relied on by the Independent Administrator was improper, unreliable, and insufficient to sustain the charges against him. Further, Senese contends that the Independent Administrator ignored his meritorious defenses and competent evidence. The challenges to the evidence now brought to this Court are the exact challenges raised by Senese before the Independent Administrator. The Independent Administrator rejected these challenges since he deemed the Wacks affidavit and testimony to be credible and trustworthy. His conclusion that there was just cause to sustain the charges against Senese on the basis of the evidence offered must be affirmed.

The evidence introduced by the Investigations Officer against Senese was considerable. Lonardo placed Senese with Joey Aiuppa, the boss of the Chicago organized crime family, and Jackie Cerone, that organization's underboss. Presser told the FBI that Senese was a member of the Chicago La Cosa Nostra code named "Big Banana," that Senese was a violent "animal," and that Senese assumed greater responsibility in the Chicago La Cosa Nostra organization when his supervisor Aiuppa went to prison. Williams told the FBI that Senese's local [703] was mob controlled. Senese was the victim of shotgun-blast to the head attempt on his life. The FBI had previously warned Senese that a mob-related attempt on his life was planned. FBI surveillance photographs placed Senese with Jackie Cerone Jr., son of the incarcerated Jackie Cerone. The cooperating witness observed that Senese met in a restaurant on many occasions with Angelo LaPietra, who was a street boss in the Chicago La Cosa Nostra. That witness also observed that Senese met in that same restaurant with John DiFronzo, the current underboss of the Chicago

La Cosa Nostra. There was also Wacks' conclusion as an expert, that based on the available information, Senese met the FBI's criteria to be considered a member of the Chicago La Cosa Nostra.

Senese challenges as unreliable hearsay the facts supplied to Wacks by Presser and Williams. He further argues that the deposition testimony of Lonardo that placed Senese with Aiuppa and Cerone should be rejected since Lonardo was available to testify at the disciplinary hearing. Senese purportedly challenges this evidence's sufficiency, but in reality questions its admissibility. Senese does not refute the substance of this evidence. This Court has already affirmed the Independent Administrator's determination that the evidence from Special Agent Wacks was credible. Since Senese may point to no rebuttal evidence, there is no further basis to find that it was arbitrary or capricious for the Independent Administrator to consider and give weight to this evidence.

Senese challenges three conclusions drawn by the Independent Administrator from the evidence. Senese (1) notes that Lonardo could not hear the substance of the conversation between Senese, Aiuppa, and Cerone, (2) questions the basis for the determination by the FBI that the persons he associated with were members of La Cosa Nostra, and (3) asserts that the attempt on his life was not La Cosa Nostra related.

Senese does not point to any facts in the record to support his assertion that Messrs. Aiuppa, Cerone, Cerone, Jr., DiFronzo, or LaPietra—the persons that he associated with—were not members of La Cosa Nostra. The Wacks affidavit and testimony indicate that each of these individuals were members of La Cosa Nostra in supervisory positions. There is no basis to suspect that these conclusions by the FBI are not correct.

Senese also challenges the conclusion by the Independent Administrator that the January 21, 1988 attempt on Senese's life was "mob-related." Special Agent Wacks indicated that the FBI warned Senese that from its own surveillance information, the

FBI felt Senese's life may be in danger. Senese suffered a shotgun blast to his head, which he survived. Senese argues that some accounts indicated that the shooting may have been IBT, and not La Cosa Nostra related. The assertion by Senese that the shooting was related to his union duties is pure fantasy. Considering the evidence before the Independent Administrator, his finding the shooting mob-related was not arbitrary or capricious.

 Senese next argues that the Independent Administrator failed to consider Senese's meritorious defenses. Senese claims that Article XIV, § 3(d) of the IBT constitution bars his facing disciplinary charges stemming from conduct which occurred prior to his current term of elective office if the conduct was "known generally" to the membership. This Court and the Court of Appeals have ruled that Article XIX, § 3(d) is only a bar to *actions* known generally to the membership, not *allegations*. *See* November 2, 1989 Order, *supra*, 725 F.Supp. at 165, *aff'd* 905 F.2d 610 (2d Cir.1990); March 13, 1990 Order, *supra*, 743 F.Supp. at 165–166, *aff'd* 905 F.2d 610 (2d Cir.1990); *United States v. International Brotherhood of Teamsters*, 905 F.2d 610, 617–18 *supra*. Frank Wsol testified for Senese that the membership had reelected Senese despite public allegations of Senese's La Cosa Nostra involvement. The Independent Administrator determined that the membership of Local 703 reelected Senese with knowledge of the allegations against him, not his conduct, making this defense unavailable. That determination was neither arbitrary nor capricious.

Senese further argues that the Independent Administrator ignored the testimony of his character witnesses. Two of these witnesses testified that Senese had obtained benefits for the membership of Local 703. A priest testified to the good character and charitable nature of Senese. The Independent Administrator discounted the importance of this general character testimony to the charges. As the trier of fact, the Independent Administrator's judgments of the credibility and weight to accord witnesses' testimony must be given

great deference. Further, even if given full credence, this character testimony does not refute the evidence offered to the substance of the charges. There is nothing in the record to indicate that the Independent Administrator's decision to give this character testimony little weight was arbitrary or capricious.

As the Independent Administrator carefully determined, the testimony from Special Agent Wacks supported the conclusion that Senese knowingly associated with organized crime figures. The evidence before the Independent Administrator supported his finding just cause to sustain the charges against Senese, and this determination was not arbitrary or capricious.

### 2. The Evidence Against Talerico

The Independent Administrator determined that there was just cause to sustain two separate charges of violating Article II, § 2(c) and Article XIX, § 6(b) against Talerico. Talerico argues both determinations were arbitrary and capricious.

#### a. Prior Criminal Conduct

 The first charge proved against Talerico was that he brought reproach upon the IBT by being held in civil and criminal contempt for his refusal to testify before a federal grand jury investigating the skimming of funds from a Las Vegas, Nevada casino, after being granted immunity, while he was business agent of Local 727. The Independent Administrator determined that Talerico's refusal to cooperate with the federal investigation, coupled with the fact that he was held in criminal contempt and spent time in prison, constituted bringing reproach upon the union.

Talerico argues that it was unfair for the Independent Administrator to consider his refusal to testify before the grand jury as proof of his crime of criminal contempt. Talerico states that his criminal conviction for contempt was a plea *nolo contendere.* Rule 11 of the Federal Rules of Criminal Procedure bars the admission of such pleas against the person who pled *nolo contendere* as proof of the underlying conduct.

The Investigations Officer argued, and the Independent Administrator agreed, that *nolo contendere* pleas were admissible in the hearing. Pleas of *nolo contendere* are admissible in labor arbitration hearings to establish just cause to find the charged party has committed the underlying offense. *In re Alpha Beta Co. and United Food and Convenience Workers, Local 770,* 91 Lab.Arb. (BNA) 1225 (1988); *Great Scot Food Stores,* 73 Lab.Arb. (BNA) 147 (1979); *The Great Atlantic & Pacific Tea Company,* 45 Lab.Arb. (BNA) 495 (1965). The Independent Administrator's determination in this regard was not arbitrary or capricious.

 Talerico further argues that the Independent Administrator was arbitrary and capricious in sustaining the charges against him because he was not on notice that exercising his Fifth Amendment privilege could be violative of his IBT oath. The Independent Administrator considered the serious nature of the grand jury investigation, that Talerico had been granted immunity from prosecution, and Talerico's suspicious behavior during the period being investigated by the grand jury. Based on these facts the Independent Administrator determined that there was just cause to conclude that Talerico's refusal to testify brought reproach upon the IBT. The Independent Administrator reasoned that an IBT officer refusing to cooperate with a grand jury investigating organized crime corruption would bring reproach upon the IBT. I cannot find that this decision was arbitrary or capricious.

#### b. Knowingly Associating With Organized Crime Figures

 The Independent Administrator concluded that just cause existed to find that Talerico had violated Article II, § 2(a) and Article XIX, § 6(b) of the IBT constitution by knowingly associating with Philip Ponto, a member of organized crime, on five instances in 1981, and one in 1982. Talerico admits that he met with Ponto on the occasions identified by the Investigations Officer. However, Talerico challenges the finding of the Independent Administrator that Talerico knew that Philip

Ponto was a member of La Cosa Nostra during 1981 and 1982.

The Independent Administrator relied on the affidavit of Special Agent Charlie J. Parsons, the FBI Organized Crime Supervisor for the Las Vegas Division. Special Agent Parsons supervised the investigation into the Las Vegas casino skimming scheme by the Chicago La Cosa Nostra. Special Agent Parsons indicated that Ponto was a member of the Chicago La Cosa Nostra at the time of the meetings in question. (Ex IO-2, ¶ 12). Special Agent Parsons averred that he personally observed Talerico meet with Ponto in Las Vegas, and the Las Vegas area. (Ex. IO-2, ¶ 8).

Talerico argues that his contact with Ponto did not constitute "knowing association" with an organized crime figure, since he claims that in 1981 and 1982 he was unaware that Ponto was affiliated with organized crime. Talerico offered no evidence to rebut Agent Parsons' conclusion that Ponto was a member of La Cosa Nostra. The record supports the Independent Administrator's finding that Ponto was a member of La Cosa Nostra at the time of his six confirmed meetings with Talerico.

Further, the extent of Talerico's contact with Ponto was sufficient to constitute "knowing association." The Independent Administrator determined that "knowing association" should be inferred from the "duration and quality" of the association. The Independent Administrator considered the evidence before him and concluded that Talerico knew or should have known that Ponto was a member of La Cosa Nostra. The Independent Administrator considered that Talerico's contact with Ponto was purposeful and not fleeting. Accordingly, the Independent Administrator determined that Talerico knowingly associated with Philip Ponto, a member of La Cosa Nostra.

The record supports the finding of the Independent Administrator. Special Agent Parsons averred that Talerico regularly travelled under assumed names between Chicago and Las Vegas to transport the illegally skimmed monies from Las Vegas to the Chicago organized crime families. It was admitted by Talerico that he met with Parsons on the occasions in question. Talerico has not refuted that Ponto was a member of La Cosa Nostra during the meetings in question. Special Agent Parsons concluded that on the basis of the observed meetings between Ponto and Talerico, and his selection to transport the monies between Chicago and Las Vegas, Talerico was a close associate of the Chicago La Cosa Nostra.

The unrefuted facts relied on by the Independent Administrator in reaching his determination that Talerico's association with Ponto was knowing, purposeful and not fleeting were sufficient to find the charges had been proved against Talerico. The Independent Administrator considered that Talerico travelled to Las Vegas to meet with Ponto under assumed names, the circumstances surrounding the meetings between Talerico and Ponto, that the meetings took place in rest areas, parking lots and grocery stores, and that the conversations were punctuated with exchanges of packages and envelopes. The Independent Administrator's determination was not arbitrary or capricious.

Talerico's other arguments are unpersuasive. There is no fundamental unfairness from being charged in 1990 for conduct that occurred in 1981 and 1982. Talerico's argument that his association under the charged circumstance with Ponto, an organized crime figure, cannot "bring reproach" upon the IBT is ludicrous. His assertion that these charges constitute vindictive prosecution by the Government is similarly absurd. That Talerico insists that his travel under assumed names was his "own business" is of no moment in refuting the evidence against him. The Independent Administrator correctly concluded that Talerico knowingly associated with an organized crime figure, namely Philip Ponto. This conclusion was not arbitrary or capricious.

### C. Penalties Imposed by the Independent Administrator

#### 1. Severity of the Penalty

■ The Independent Administrator imposed lifetime suspensions from the IBT on

Talerico, Senese and Cozzo. Talerico and Senese argue that the severity of this penalty is out of proportion to their conduct. They argue that the penalty is not permitted by the LMRDA, 29 U.S.C. § 504. They further assert that the Independent Administrator imposed severe penalties out of animus for Italian–Americans.

That the IBT has historically been tainted by corruption is beyond dispute. A review of the evidence indicates that Cozzo, Talerico and Senese were found to be engaging in the exact conduct that this Consent Decree intends to root out of the IBT. The evidence established that Senese was a member of the Chicago La Cosa Nostra. The evidence established that Talerico met with known organized crime figures under suspicious circumstances and opted to spend a period of time in prison rather than testify before a grand jury investigating corruption. The evidence established that Cozzo was a member of the Chicago La Cosa Nostra.[2] Such behavior is antithetical to any standard of appropriate conduct for a union officer. Accordingly, the penalty imposed by the Independent Administrator is neither arbitrary nor capricious. Finally, it is well within the power of the Independent Administrator to impose lifetime suspensions, since § 101(a)(5) of the LMRDA contemplates that a union member may be "fined, suspended or *expelled*" by that union. 29 U.S.C. § 411(a)(5) (emphasis added). As a result, 29 U.S.C. § 504 is inapplicable.

Senese and Talerico argue that this Court should review a lifetime suspension from the IBT with greater scrutiny than other determinations since such a penalty is in essence a "death penalty." The Consent Decree does not provide for any greater review of a penalty determination than any other action of the Independent Administrator. But that is of no matter, since this Court has and will continue to review every determination of the Independent Administrator with great care and diligence. Given that the goal of the IBT is to be free of the hideous influence of organized crime, the Independent Administrator's decision that a lifetime suspension was the appropriate penalty was not arbitrary or capricious.

Finally, Senese and Talerico posit that the Independent Administrator imposed more severe penalties on them than on Friedman and Hughes out of a bias against Italian–Americans. There is not one iota of evidence in the record to support this wild and desperate assertion by Senese and Talerico. Such irresponsible statements by parties and counsel are unprofessional, and bespeak complete incompetence.

### 2. The Inclusion of Health, Welfare and Pension Benefits

The Independent Administrator asked this Court to clarify his power to terminate health and welfare benefits of IBT members as part of any penalty he imposes. The prudent procedure for this Court to consider this question is for the Independent Administrator to first decide the question after full briefing from the parties, and then submit that determination to this Court for review.

### III. Conclusion

The decisions of the Independent Administrator with respect to the sufficiency of the charges against Senese, Talerico, and Cozzo are hereby affirmed. The decisions of the Independent Administrator that Senese, Talerico, and Cozzo should be given lifetime suspensions from the IBT are hereby affirmed. The question of whether the penalties imposed on Senese, Talerico, and Cozzo should include the termination of health and welfare benefits is returned to the Independent Administrator for a determination. The stay on the imposition of the other penalties is hereby dissolved, and they shall be effective immediately.

SO ORDERED.

---

2. As noted earlier, Cozzo defaulted by not appearing at his hearing before the Independent Administrator, and failed to appear before this Court.