UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, et al., Defendant.

In re: APPLICATION XLVII OF THE INDEPENDENT REVIEW BOARD.

No. 88 Civ. 4486 (DNE).

United States District Court, S.D. New York.

May 21, 1997.

## OPINION AND ORDER

EDELSTEIN, District Judge.

This opinion emanates from the voluntary settlement of an action commenced by plaintiff United States of America against, *inter alia*, defendants International Brotherhood of Teamsters ("IBT") and the IBT's General Executive Board embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). Pursuant to the Rules and Procedures for Operation of the Independent Review Board for the International Brotherhood of Teamsters ("IRB Rules"), ¶ O, the Independent Review Board ("IRB") has made an application to this Court seeking approval of its decision in this matter.

Application XLVII presents for this Court's review the decision of the IRB re-

garding disciplinary charges brought against Mario F. Perrucci ("Perrucci"), a former IBT Vice President, a former Secretary–Treasurer of IBT Local 177 ("Local 177" or "the Local"), as well as a former trustee of the Local 177 Pension Plan. These charges are contained in an investigative report issued by the IRB on July 12, 1995.[1] (IRB Investigative Report in the Matter of Mario F. Perrucci, ("IRB Report") (July 12, 1995).) In this report, the IRB charged Perrucci as follows:

> [*Charge One:*] While an officer of Local 177 and a union Trustee on the Local 177 Pension Plan, you brought reproach upon the IBT by breaching your fiduciary duties and accepting a thing of value from an employer under contract with Local 177 in violation of Article II, Section 2(a) and Article XIX, Section 7(b)(1), (2) and (13) of the IBT Constitution *to wit:*

> In or about May 1994, you obtained a 1986 Bayliner Bowrider 23–foot boat for no more than $100 from Joseph Eletto Transfer, Inc., an employer of Local 177 members. At the time you obtained the boat from Joseph Eletto Transfer [Inc.], the fair market value of the boat was, at least, between $2,900 and $4,900. When you obtained this boat, you were a Local 177 officer and Local 177 had a collective bargaining agreement with Joseph Eletto Transfer, Inc. Moreover, at the time you obtained this boat, you were a Trustee of the Local 177 Pension Plan and employees at Joseph Eletto transfer participated in the Local 177 Pension Plan. By taking this boat for substantially less than the fair market value, you violated applicable law including 29 U.S.C. Section 186(b)(1) and 18 U.S.C. Section 1954.

> [*Charge Two:*] While an officer of Local 177 and a union Trustee on the Local 177 Pension Plan, you brought reproach upon

---

**1.** The IRB is vested with broad investigatory and disciplinary powers. The IRB's investigatory authority is coextensive with that of the General President and the General Secretary–Treasurer under the IBT Constitution and applicable law. *See* February 2, 1994, Memorandum & Order, 842 F.Supp. 1550, 1551–52 (S.D.N.Y.1994); *see also* August 19, 1991, Opinion & Order, 803 F.Supp. 761, 768 (S.D.N.Y.1992), *aff'd in relevant*

*part,* 998 F.2d 1101 (2d Cir.1993). Under the Consent Decree, the IRB must use this authority, among other things, to investigate allegations of corruption within the IBT, allegations of influence by La Cosa Nostra or other organized crime groups upon IBT members or activities, and any failure of IBT members or leadership to cooperate fully with the IRB. 842 F.Supp. at 1551–52; *see* Consent Decree § G(a).

the IBT by accepting gifts from service providers to the Local and the Local 177 Pension Plan in violation of Article II, Section 2(a) and Article XIX, Section 7(b)(1) and (2) and (13) of the IBT Constitution, *to wit:*

While an officer of Local 177 and a Trustee on the Local 177 Pension Plan, between approximately 1979 and 1990, you accepted free tax services from the accountant for Local 177 and the Local 177 Pension Plan. In addition, each year between approximately 1979 and 1994, you received free Yankee season tickets from the attorney for the Local and the Local 177 Pension Plan. By accepting gifts from service providers to the Local 177 Pension Plan while a Trustee of the Local 177 Pension Plan and a Local 177 officer whose members participated in the Local 177 Pension Plan, you violated 18 U.S.C. Section 1954.

(Opinion and Decision of the Independent Review Board ("IRB Decision") at 2 (Mar. 25, 1997).) The IRB forwarded these charges and its report to the IBT General Executive Board ("GEB") on July 12, 1995. (Letter from John J. Cronin, Jr., Independent Review Board Administrator, to International Brotherhood of Teamsters General Executive Board (July 12, 1995).)

On January 23, 1996, the GEB conducted a hearing to consider the proposed charges against Perrucci. (IRB Decision at 3.) On April 17, 1996, the GEB rendered its decision. *Id.* The GEB determined that the transfer of the boat for $100, the free Yankee season tickets, and the free accounting services all constituted gifts of value to Perrucci that were made because of Perrucci's position within the Local. *Id.* The GEB concluded that Perrucci had brought reproach upon the IBT by his violations of the IBT Constitution and federal law and imposed a two-year suspension from IBT membership and employment with the IBT. *Id.*

By letter dated June 10, 1996, the IBT informed the GEB that the IRB viewed the penalty of a two-year suspension imposed upon Perrucci as inadequate, and remanded the matter to the GEB for further consideration. (Letter from John J. Cronin, Jr., Independent Review Board Administrator, to International Brotherhood of Teamsters General Executive Board (June 10, 1996).) By letter dated October 8, 1996, IBT General President Ron Carey advised the IRB that the GEB was increasing the penalty upon Perrucci to a forty-two month suspension. (Letter from Ron Carey, IBT General President to John J. Cronin, Jr., Independent Review Board Administrator (Oct. 8, 1996).) By letter dated October 17, 1996, the IRB again advised the GEB that the IRB deemed Perrucci's penalty inadequate and that, as a result, the IRB would hear the matter *de novo.* (Letter from John J. Cronin, Jr., Independent Review Board Administrator, to International Brotherhood of Teamsters General Executive Board (Oct. 17, 1996).)

At Perrucci's request, the IRB agreed to consider the matter based upon the record created during the GEB hearing process, as well as upon supplemental submissions from each party. By letter dated December 16, 1996, Perrucci, through his lawyer, filed with the IRB a submission regarding the charges against him. (Letter from Eric Tunis, Esq., to the Independent Review Board (Dec. 16, 1996).) The IRB Chief Investigator's response to Perrucci's submission was submitted on December 30, 1996, (Memorandum of the Chief Investigator (Dec. 30, 1996)), and Perrucci's reply was submitted on January 8, 1997. (Letter from Eric Tunis, Esq., to the Independent Review Board (Jan. 8, 1997).) Based on the record of prior proceedings and the parties' submissions, on March 25, 1997, the IRB found that the charges against Perrucci had been proved. (IRB Decision at 22–23.) The IRB imposed upon Perrucci a ten-year suspension from IBT membership, and permanently barred him from "hold[ing] any position as an officer in the IBT or any of its affiliates, or obtain[ing] employment, consulting work or other work with the IBT or any IBT-affiliated entity." (IRB Decision at 24.)

Also on March 25, 1997, the IRB submitted the instant application to this Court "respectfully request[ing] that an Order be entered affirming the ... [IRB Decision]." (Application XLVII of the Independent Review Board—Opinion of the Independent Review Board in the matter of Mario F. Perrucci, *United States v. International Bhd. of Team-*

*sters,* 88 Civ. 4486 ("IRB Application XLVII") at 3 (Mar. 25, 1997)). By letter dated April 11, 1997, Chambers informed Perrucci, through his attorney, that Chambers "had not received any communication from either [Perrucci or his counsel] with regard to Application XLVII." (Letter from Jennifer A. Meyer, Law Clerk to the Honorable David N. Edelstein, United States District Judge for the Southern District of New York, to Eric Tunis, Esq. (Apr. 11, 1997).) In that letter, Chambers also informed Perrucci that "if [he] wish[es] to file any objections to Application XLVII, those objections must be: (1) in writing; (2) mailed to Judge Edelstein['s] [Chambers]; and (3) received . . . no later than ten (10) days from the date of this letter." *Id.* On May 16, 1997, long after Perrucci's objections were due, this Court received a letter from Perrucci's attorney stating that "Perrucci will not file specific objections to Application XLVII. . . ." (Letter from Eric Tunis, Esq., to the Honorable David N. Edelstein, United States District Judge for the Southern District of New York (May 13, 1997).)

### DISCUSSION

 This Court will individually review the IRB's findings with respect to the two charges against Perrucci, as well as the sanctions imposed upon him. Before doing so, this Court notes that the law of the Consent Decree is well-settled that this Court's review of the factual findings of the IRB is narrowly circumscribed. Findings of the IRB are entitled to "great deference." *See, e.g., United States v. International Bhd. of Teamsters [Friedman & Hughes],* 905 F.2d 610, 616 (2d Cir.1990), *aff'd* March 13, 1990, Opinion & Order, 743 F.Supp. 155 (S.D.N.Y. 1990); *United States v. International Bhd. of Teamsters [Raimondi & Bertino]* , 829 F.Supp. 608, 616–17 (S.D.N.Y.1993) (citing cases); IRB Rules ¶ O. This Court will overturn IRB findings only when this Court determines that they are, on the basis of all the evidence, "arbitrary or capricious." *See, e.g., United States v. International Bhd. of Teamsters [Sansone],* 981 F.2d 1362, 1368 (2d Cir. 1992); *United States v. International Bhd. of Teamsters [Wilson, Weber & Dickens],* 978 F.2d 68, 71 (2d Cir.1992); *United States v.*

*International Bhd. of Teamsters [Cimino],* 964 F.2d 1308, 1311–12 (2d Cir.1992); *United States v. International Bhd. of Teamsters [Senese & Talerico],* 745 F.Supp. 908, 911 (S.D.N.Y.1990), *aff'd.* 941 F.2d 1292 (2d Cir. 1991); *Raimondi & Bertino,* 829 F.Supp. at 616; IRB Rules ¶ O. With these constraints in mind, this Court will review IRB Application XLVII.

### I. CHARGE ONE: THE $100 BOAT TRANSACTION

With respect to the first charge against Perrucci—the $100 boat transaction—the record before the IRB contained evidence that Joseph Eletto Transfer, Inc. ("Eletto Transfer") is a trucking company engaged in the business of delivering home furniture for the Macy's department stores ("Macy's") warehouse in Raritan, New Jersey. (IRB Report at Exh. 3, at 3.) Eletto Transfer employed Local 177 members as its delivery drivers under a 1992 collective bargaining agreement which Perrucci negotiated with Eletto Transfer's previous owner, Joseph Eletto, and John Eletto ("Eletto"), the owner's son. (Transcript of Hearing Before the International Brotherhood of Teamsters General Executive Board ("Tr.") at 39, 44, 47 (Jan. 23, 1996)); (IRB Report at Exh. 14.) After John Eletto died, he was succeeded by his son as the head of Eletto Transfer. (Tr. 48.)

In March 1994, at Perrucci's insistence, Eletto met with Perrucci to discuss improved health care benefits for Eletto Transfer's Local 177 employees and other issues. (Tr. 49–50, 97.) At that time, Eletto Transfer was supplying such benefits to the Local 177 employees through the health plan of IBT Local Union 875 which had preceded Local 177 as the union from which Eletto Transfer hired its drivers. *Id.* at 139; (IRB Report at Exh. 2, at 8.) At the meeting with Eletto, the two men discussed the liquidation of Eletto's father's estate. (Tr. 51.) According to Perrucci, Eletto said that "he had some toys of his father's that he had to get rid of," including an eight-year-old boat. *Id.;* (IRB Report at Exh. 2, at 11.) Perrucci informed Eletto that Perrucci had lived on the water for ten years and had always considered purchasing a boat. (Tr. 52); (IRB Report at

Exh. 2, at 11–12.) Eletto then offered to give his father's boat to Perrucci, but Perrucci insisted that he pay for it. (Tr. 52); (IRB Report at Exh. 2, at 11–12.) Perrucci and Eletto negotiated a price of $100 for the boat, which Perrucci paid in cash. (Tr. 52); (IRB Report at Exh. 2, at 11–12.) Perrucci provided the IRB Chief Investigator with a bill of sale indicating the sale of a 1986 Bayliner, Model 2450 Ciera Bowrider, sold "as is" for $100. (IRB Report at Exh. 23A.) The bill of sale contains a handwritten notation stating that the $100 was "paid in full" and "mailed to Local 177, Attn: Mario Perrucci, 38 Main St., Toms River, N.J." *Id.*

By letter dated May 31, 1995, the IRB Chief Investigator's Office requested information from Eletto's attorney, James Fletcher ("Fletcher") concerning the circumstances of the boat sale to Perrucci. (Letter from William P. Nugent, IRB Special Investigator to James Fletcher, Esq. (May 31, 1995).) By letter dated June 2, 1995, Fletcher responded to this request with an unsigned and undated statement from Eletto stating in pertinent part:

On December 11, 1993, my father ... spoke to me about ... the things he wanted me to complete for him [after he died].... My father's last sentence to me was get rid of that F___ boat.

At a lunch with [Perrucci], who got to know my father well, I was telling him this story. [Perrucci] inquired about the boat and I said I would not sell the boat to a friend, the boat was a disaster. I told him to take this boat in memory of my father. He refused and said he could not take it. We made a deal, that he would buy the boat for $100.00, he would ship it to Tom's [sic] River and he would make whatever repairs [were] necessary. I made [Perrucci] swear that no matter what the boat cost him, it would not effect [sic] our friendship.

(IRB Report at Exhs. 18, 19.)

Perrucci maintains that the boat did not constitute a "thing of value" because the boat was worthless. The boat measures twenty-three feet eight inches in length, and is powered by a 260 horsepower Volvo inboard/outboard engine. *Id.* at Exh. 23L. In addition to the $100 purchase price, Perrucci claims that he has spent $2,500 to $3,000 in repairs on the boat. (Tr. 136.) Perrucci paid approximately $500 to ship the boat from Long Island, New York, to his home in southern New Jersey. (Tr. 66.)

The parties presented conflicting evidence to the IRB regarding the boat's value. (IRB Decision at 11.) According to the 1995 edition of the Marine Blue Book, which bills itself as "[a] complete reference of dealer prices, loan values, comparable specifications and wholesale prices" for boats, (IRB Report at Exh. 9), the list price in 1986 for a new Bayliner 2450 Ciera Sportcruiser with a 260 horsepower Volvo engine was $21,295. *Id.* The Marine Blue Book states that that boat had a 1995 trade-in value of between $8,518 and $10,435. *Id.* The IRB was also presented with other marine 1995 publications which listed the value of 1986 twenty-four foot Bayliner boats between $9,800 and $10,900. (IRB Decision at 11.)

In support of his claim that the boat was worthless, Perrucci offers as evidence the appraisal of William Campbell ("Campbell"), a marine surveyor retained by Perrucci. *Id.*; (IRB Report at Exh. 23L(7).) After inspecting Perrucci's boat on May 24, 1996, Campbell "estimated the value of the vessel as equipped as $1,200 and this is the salvage value." (IRB Report at Exh. 23L(7).) The term "salvage value," according to Campbell, means "the estimated value of property at the end of its useful life." *Id.* Campbell further stated that it would require $10,000 in repairs to bring Perrucci's boat "up to BUC condition 3," or, in other words, "ready for sale requiring no additional work and normally equipped for [the boat's] size." *Id.* Campbell also estimated that approximately one year before Perrucci purchased the boat, it had a negative value of $2,300, a figure which takes account of the $3,507 in expenses and repairs which Perrucci made in the boat. *Id.* at Exh. 23L(6). Accordingly, Campbell concluded that the "boat should have been totalled at the time of sale[,] and [that] the $100 offer was a gift" from Perrucci. *Id.*

Perrucci also offered as evidence the results of an inspection of the boat by William Kaye ("Kaye"). *Id.* at Exh. 23M. After inspecting the boat on May 14, 1995, Kaye

declared that the boat had a "negative value," and that it would require repairs totaling $9,227 to restore the boat to operating condition such that it could be insured. *Id.* at Exh. 23M(4), (5). This figure also includes $4,840 in cosmetic repairs "to make the boat attractive enough to encourage buyers." *Id.* at Exh. 23M(5). In rendering its decision, the IRB noted that "Kaye did not assign a value to the boat as of the date of [Perrucci's] purchase," and that "[n]either of Perrucci's surveyors actually operated the boat or started the engine during their respective inspections." (IRB Decision at 13.)

To ascertain whether Perrucci's boat is, indeed, "a thing of value," the IRB's Chief Investigator hired Paul Robinson ("Robinson"), an "accredited marine surveyor" and "an expert in the field of boat appraisals" to inspect the vessel and to appraise its market value. (IRB Report at Exh. 24.) On June 29, 1995, Robinson inspected the boat, and found it "to be in fair overall condition" and "serviceable and apparently seaworthy," albeit "cosmetically distressed." *Id.* at Exh. 25, at 3. Robinson estimated the market value of the boat in May 1994 as $4,900, and that, as of June 29, 1995, the boat was worth $4,650 due to depreciation. *Id.* at Exh. 26.

In addition to Robinson, the Chief Investigator also retained Charles Balsamo ("Balsamo"), the owner of a boatyard and boat repair business on Long island, to estimate the market value of Perrucci's boat. *Id.* at Exh. 27. On June 29, 1995, Balsamo inspected Perrucci's boat and found that it had a market value of $4,360. *Id.* Balsamo performed this inspection, however, after his boat yard had made approximately $1,400 in repairs to the boat's engine. *Id.* Balsamo therefore stated that, if those repairs were necessary, the boat would have had a value of approximately $2,900 when purchased. *Id.*

Finally, in rendering its decision, the IRB reviewed the testimony of Peter Hartoft ("Hartoft"), a marine surveyor who "has personally conducted approximately four hundred boat surveys per year, and [who has] surveyed Bayliners of different sizes including that of Perrucci's boat." (Tr. 147.) Hartoft appraised the boat based upon photographs and the other surveyors' reports. *Id.*

at 146–48. Hartoft testified that Perrucci's boat, in the condition in which Perrucci purchased it (requiring "substantial yard work and devoid of extras"), had a retail value of between $4,900 and $5,600. *Id.* at 157–58. Hartoft also criticized the appraisals offered by Perrucci. Of the over $10,000 in repairs recommended by Campbell, Hartoft stated that only about $1,250 were essential. *Id.* at 351–58. He further explained that Kaye and Campbell considered the boat worthless because they assessed its value only after subtracting the cost of trying to create a perfectly maintained vessel with new equipment, *id.* at 173, 379–81, rather than simply trying to make the boat operational. *Id.* at 377–79.

Based on the evidence presented to it, the IRB determined that "Perrucci violated the IBT Constitution ... by bringing reproach upon the IBT" by purchasing the boat from Eletto for just $100. (IRB Decision at 22.) As noted above, Perrucci has chosen to make no objections to the IRB's findings.

■ Article XIX, Section 7(b)(13) of the IBT Constitution prohibits union members and officers from "[a]ccepting money or other things of value from any employer or any agent of any employer, in violation of applicable law." IBT Const. art. XIX, § 7(b)(13). The "applicable law," in this context, is found in two federal statutes. First, Title 29, United States Code, Section 186 ("Section 186"), the Labor Management Relations Act, bars a union officer from accepting any thing of value from an employer. *See* 29 U.S.C. § 186. Section 186's prohibition against payments by employers to union officials does not apply, however, to the "purchase of an article or commodity at the prevailing market price in the regular course of business." 29 U.S.C. § 186(c)(3). Moreover, a violation of Section 186 does not require that the transfer of a thing of value to a union official be done with a corrupt purpose—it is the transfer itself which is banned. *See United States v. Ricciardi,* 357 F.2d 91, 99 (2d Cir.) ("[i]t seems reasonable to impute to Congress an intent to outlaw *all* payments, with certain narrow statutory exceptions, from employer to union official") (emphasis in original), *cert. denied,* 384 U.S. 942, 86 S.Ct. 1464, 16 L.Ed.2d 840 (1966).

With respect to Section 186, the IRB found that "it is undisputed that Perrucci purchased the boat from an employer of Local 177 while Perrucci served as an officer of the Local." (IRB Decision at 20.) The IRB also determined that "[o]ur review of the record of the [GEB] hearing leads us to conclude, as did the GEB, that Perrucci paid substantially less than market value for the boat." *Id.* The IRB, like the GEB before it, chose not to credit the expert testimony proffered by Perrucci concerning the boat's alleged worthlessness. *Id.* at 15, 20. Instead, the IRB accepted Hartoft's characterization of Perrucci's expert's testimony: that Campbell and Kaye's calculations were exaggerated by including the cost of restoring the boat to "perfect condition and equip it with extras," and subtracting those costs from "the highest retail value the boat could bear on the used boat market." *Id.* at 20. Such a methodology, Hartoft explained, "is not a realistic approach when seeking to appraise value and seaworthiness." *Id.*

In addition, the IRB found that "[l]ogic also compels the conclusion that Perrucci, when he paid $100 . . . believed he was paying less than market value for a boat he had never seen and had not had appraised." *Id.* The IRB reasoned that if Perrucci had wanted the boat at market value, "he should have had a qualified appraisal done, yielding a price he would have paid." *Id.* The IRB also rejected Perrucci's argument that he violated no law because the boat transaction proved to be an economic disaster for him. *Id.* The IRB found that, while the boat's financial liability to Perrucci was "true," that assessment was *post hoc*, as it was made well after Perrucci's purchase of the boat. As the IRB noted in its decision, "it never entered [Perrucci's] mind when he purchased [the boat] that he was buying a disaster." *Id.*

Moreover, the IRB determined that "Perrucci's conduct after he purchased the boat contradicts the notion that the boat had no value." *Id.* at 21. The facts upon which the IRB relied in making this statement included: (1) that Perrucci spent $500 to transport the boat to his home; (2) that he took his six-month old grandchild and three other people into the Atlantic Ocean on the boat without first having a mechanic insure its safety; and (3) that he spent an addition $4,200 on the boat over the next two seasons. *Id.* The IRB found that "[t]hese are investments he surely would not have made if the boat only had a $100 value." *Id.* The IRB thus found that Perrucci violated Section 186 "by accepting a thing of value from an employer while a union officer," and that, accordingly, he violated the IBT Constitution. *Id.* at 21–22.

■ As explained above, this Court can reject a determination by the IRB only if this Court finds the IRB determination to be "arbitrary and capricious." *See, e.g., Sansone,* 981 F.2d at 1368; *Wilson, Weber & Dickens,* 978 F.2d at 71. This Court cannot make such a finding with respect to Perrucci's Section 186 violation. The IRB's decision to discount the testimony of Perrucci's expert's regarding the boat's value was not arbitrary. The IRB simply accepted the testimony of Hartoft, who reasonably explained that Perrucci's expert's inflated the repair costs necessary to restore the boat by insisting that the boat be upgraded to perfect condition. The IRB's decision to believe one expert over another on this basis cannot be characterized as arbitrary. Moreover, the IRB's finding that Perrucci's conduct exhibited a belief that he had purchased a boat worth more than $100 is not arbitrary or capricious. It was not arbitrary or capricious for the IRB to find that Perrucci would not have invested thousands of dollars and ventured into the ocean with his grandchild in a boat which he believed was worth just $100.

■ The second applicable statute, Title 18, United States Code, Section 1954 ("Section 1954") prohibits a person in a position of authority within a union from "receiv[ing] or agree[ing] to receive or solicit[ing] any fee, kickback, commission, gift, loan, money, or thing of value because of or with intent to be influenced [in his exercise of union authority]." 18 U.S.C. § 1954. Like Section 186, a corrupt *mens rea* on the part of the recipient is not necessary to a violation of Section 1954. *See United States v. Friedland,* 660 F.2d 919, 926 (3d Cir.1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2268, 73 L.Ed.2d 1283 (1982); *United States v. Roberto,* 801 F.Supp.

946, 948–49 (D.Conn.1992). Rather, Section 1954 is violated if a union official simply receives a thing of value "because of" his union position. *See Roberto,* 801 F.Supp. at 948.

The IRB found that "it appears that Perrucci violated [Section 1954] in that the reason the boat was offered to Perrucci was because of his position as a union representative and union Trustee on the pension fund." (IRB Decision at 21–22.) In rendering this finding, the IRB reasoned that "it can be reasonably inferred" that Eletto sold the boat to Perrucci at a steep discount "because of [Perrucci's] position as Local 177 Pension Fund Trustee, Local officer and business agent to Eletto Transfer, positions which Eletto knew offered Perrucci the ability, if he wished to exercise it, to influence negotiations between Local 177 and Eletto Transfer ..." *Id.* at 22. While the IRB concedes that there is no evidence that Perrucci was influenced by the boat transaction, as explained above, actual influence is not the standard for determining a Section 1954 violation. *See Roberto,* 801 F.Supp. at 948. As a result, this Court finds that the IRB's determination that Perrucci violated Section 1954 is not arbitrary and capricious.

Because this Court has found that the IRB's determinations that Perrucci violated both Section 186 and Section 1954 are not arbitrary or capricious, it necessarily follows that this Court must find that the IRB's judgment that Perrucci breached the IBT Constitution also is not arbitrary or capricious. As explained above, Article XIX, Section 7(b)(13) is violated whenever an IBT official receives anything of value from an employer in violation of applicable law. Here, the IRB found that all of those prerequisites exist: Perrucci (an IBT official) received a thing of value (the boat) in violation of applicable law (Sections 186 and 1954). Because this Court finds that none of those determinations are arbitrary or capricious, this Court finds that the IRB's judgment that Perrucci breached the IBT Constitution also is not arbitrary or capricious.

## II. CHARGE TWO: FREE ACCOUNTING SERVICES & YANKEE TICKETS

The evidence before the IRB established that, by Perrucci's own admission, shortly after he became Secretary–Treasurer of Local 177 in 1978, he hired Bernard Hecht ("Hecht") as the accountant for the Local and for the Local's pension fund from 1979 through 1993. (Tr. 91); (IRB Report at Exh. 2, at 20–121.) Perrucci admitted that Hecht offered the Local 177 board members "assistance with their taxes," (Tr. 88), and that, to his knowledge, all of the board members and business agents accepted Hecht's offer of free accounting services. *Id.* at 88–89. Perrucci also testified that he utilized Hecht's free services for most of the years Hecht worked as the Local's accountant. *Id.* at 90–92. Another Local 177 trustee, Richard Carunchio ("Carunchio"), stated that he received free tax services from Hecht during the years Hecht worked for the Local, but that Carunchio paid Hecht $150 each year for his services after Hecht stopped working for the Local. (IRB Report at Exh. 21, at 4, 8–9.)

The IRB also reviewed testimony from Perrucci that each year from 1979 to 1994, Albert Parsonnet ("Parsonnet"), an attorney who represented Local 177 and the Local 177 Pension Fund, from 1978 through 1995, gave Perrucci four season tickets to the New York Yankees home baseball games. *Id.* at Exh. 2, at 18; (Tr. 75–76.) These tickets possessed a cumulative face value of $56,052. (Tr. 81–83.) Perrucci testified that the Yankees sent the tickets and an invoice directly to Perrucci at Local 177, and that he would keep the tickets and forward the invoice to Parsonnet. *Id.* at 78, 80, 105. Perrucci maintains that he distributed most of the tickets to the Local members on a first-come, first-serve basis, and that, on occasion, he utilized the tickets himself. *Id.* at 79, 85–86; (IRB Report at Exh. 1, at 66–68.) There was no formal ticket distribution mechanism, and no records exist concerning the ultimate recipients of the Yankee tickets. (Tr. 86–87, 106.)

The IRB determined that Perrucci's acceptance of free accounting services and Yankee

tickets from Hecht and Parsonnet, respectively, violated Section 1954. As explained above, Section 1954 bans a person in a position of authority within a union from "receiv[ing] or agree[ing] to receive or solicit[ing] any fee, kickback, commission, gift, loan, money, or thing of value because of or with intent to be influenced [in his exercise of union authority]." 18 U.S.C. § 1954. Section 1954 is violated if a union official receives a thing of value "because of" his union position. *See Roberto,* 801 F.Supp. at 948.

To reiterate, this Court may reject the IRB's findings only if they are arbitrary and capricious. *See, e.g., Sansone,* 981 F.2d at 1368; *Wilson, Weber & Dickens,* 978 F.2d at 71. In light of the evidence upon which the IRB based its determination, this Court is unable to find that the IRB was arbitrary and capricious. Indeed, this Court cannot imagine that the IRB could require more solid evidence of a Section 1954 violation than Perrucci's own admissions that he received services and gifts Local 177's accountant and lawyer while he was a Local 177 officer. Section 1954 merely requires that a union official receive things of value "because of" their position within the union. *See Roberto,* 801 F.Supp. at 948. Hecht and Parsonnet each plainly possessed an economic interest in maintaining their business relationship with Local 177. It is thus not arbitrary or capricious to find, as the IRB did, that Hecht and Parsonnet gave gifts to Perrucci because of his status as Local 177 officer with the power to influence the continuation of Local 177's business relationships with Hecht and Parsonnet. This Court therefore finds that the IRB's finding that Perrucci violated Section 1954 was not arbitrary and capricious. In addition, as explained above, by violating Section 1954, Perrucci necessarily violated the Article XIX, Section 7(b)(13) of the IBT Constitution. Accordingly, this Court finds that the IRB was not arbitrary or capricious in finding that Perrucci breached the IBT Constitution by accepting free Yankee tickets and accounting services.

### III. SANCTIONS

In light of its findings that both charges against Perrucci had been proved,

the IRB imposed upon Perrucci the following sanctions: (1) a permanent ban from holding "any position as officer in the IBT or any of its affiliates, or obtain[ing] employment, consulting or other work with the IBT or any IBT-affiliated entity"; and (2) a ten-year suspension from IBT membership. (IRB Decision at 24.) In imposing the ten-year suspension, the IRB explained that

[w]hile Perrucci's conduct did not involve organized crime activity or a pervasive violation of the rights of the [Local 177] membership [which would merit permanent union expulsion], and notwithstanding that there has been no finding that Perrucci's conduct influenced his negotiations with Eletto, we nonetheless regard Perrucci's misconduct as serious enough to warrant the additional sanction of suspension of his IBT membership for ten years.

*Id.*

Like other IRB judgments, this Court may reject the sanctions which the IRB imposes only if they are arbitrary and capricious. *See Wilson, Weber & Dickens,* 978 F.2d at 73–74. In the instant case, this Court finds that the sanctions which the IRB imposed upon Perrucci are not arbitrary or capricious. Perrucci has manifested a willingness to utilize his position of power and influence to enrich himself. Moreover, he has exhibited this unfortunate trait over an extended period of time. For example, Perrucci accepted free accounting services for a decade and free Yankee tickets for fifteen years. By abusing his power in such a perpetual manner, Perrucci has shown himself to be unfit ever again to be entrusted with influence and authority within the IBT. As well, because Perrucci enjoyed greater perks than he was entitled to as a leader within the IBT, a fitting additional sanction is to bar him from rank-and-file membership for ten years, so that he may not enjoy the benefits which even that lesser station provides. Accordingly, this Court finds that the sanctions imposed upon Perrucci by the IRB are not arbitrary and capricious, and that the IRB's decision should be affirmed in all respects.

### CONCLUSION

IT IS HEREBY ORDERED THAT the findings and sanctions of Application XLVII

of the Independent Review Board are AF-FIRMED.

SO ORDERED.