UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.

In re Application XXII of the INDEPENDENT ADMINISTRATOR.

No. 88 CIV. 4486 (DNE).

United States District Court, S.D. New York.

May 9, 1991.

See also 764 F.Supp. 787.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. (Edward T. Ferguson, III, Asst. U.S. Atty., of counsel), New York City, for the U.S.

Charles M. Carberry, Investigations Officer of the Intern. Broth. of Teamsters, (Robert W. Gaffey, of counsel), Anderson, Kill, Olick & Oshinsky, New York City (Jubelirer, Pass & Intrieri, Joseph J. Pass,

Jr., Robert Eberle, Pittsburgh, Pa., of counsel), for Theodore Cozza.

## MEMORANDUM & ORDER

EDELSTEIN, District Judge:

This order emanates from the voluntary settlement in the action commenced by plaintiff United States of America (the "Government") against defendants International Brotherhood of Teamsters (the "IBT") and the IBT's General Executive Board (the "GEB") embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). The remedial provisions in the Consent Decree provided for three Court-appointed officials, the Independent Administrator to oversee the remedial provisions, the Investigations Officer to bring charges against corrupt IBT members, and the Election Officer to oversee the electoral process leading up to and including the 1991 election for International Officers (collectively, the "Court Officers"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime.

Application XXII presents for this Court's review the opinion and supplemental opinion of the Independent Administrator deciding the disciplinary charges against Theodore R. Cozza. Cozza, a defendant in the underlying litigation and a signatory to the Consent Decree, is a member of the GEB as the Ninth Vice President; the Secretary–Treasurer of the Eastern Conference of Teamsters Policy Committee; the President of Local 211 in Pittsburgh, Pennsylvania, and chairman and trustee of the funds operated by IBT Local 211, the Employee Welfare Fund, and the Prepaid Legal Service Fund.

Cozza was charged by the Investigations Officer with violating Article II, § 2(a) of the IBT constitution. Article II, § 2(a) is the IBT membership oath, which provides in pertinent part that every IBT member shall "conduct himself or herself in a manner so as not to bring reproach upon the Union ..." The charge alleged that Cozza had conducted himself in a manner to bring reproach upon the IBT by knowingly associating with members of La Cosa Nostra from January 1, 1970 to the present. The Investigations Officer charged Cozza with knowingly associating with six members of the Pittsburgh area La Cosa Nostra.

The Independent Administrator determined that the Investigations Officer had met his burden and demonstrated just cause that the charge had been proved. The Independent Administrator determined that the following five of those individuals named by the Investigations Officer, John S. LaRocca, Gabriel "Kelly" Mannerino, Michael Genovese, Joseph "JoJo" Pecora, and Joseph Sica, were members of La Cosa Nostra (the "five individuals"). The Independent Administrator further determined that Cozza had knowingly associated with those five individuals. The proof against Cozza is fully set out in the Independent Administrator's opinion, attached to this memorandum as the Appendix, and need not be repeated here. (Appendix, at 806–13). The Independent Administrator imposed the penalty of permanent debarment from the IBT. Further, the Independent Administrator determined that the IBT or any affiliated entity should make no further payments to any of Cozza's five pension plans, or his three health and welfare benefit plans.

In the hearing before the Independent Administrator and in his papers before this Court, Cozza admits that he associated with the five individuals. Rather, in his voluminous appeal of the Independent Administrator's opinions, Cozza argues (i) he was denied pre-hearing discovery, (ii) the charge was unspecific, (iii) the charge violates his first and fifth amendment rights, (iv) he was unaware that those five individuals were members of La Cosa Nostra, and (v) the membership of Local 211 knew generally of his association with these individuals. Considering the unrefuted proof before the Independent Administrator, Cozza's position as a leader of the IBT, and the nature of the charges against him, these arguments are disingenuous, contrary to established law, and totally without merit.

## I. Standard Of Review

With respect to the disciplinary provisions of the Consent Decree, the Court of

Appeals and this Court have now determined that the Investigations Officer and Independent Administrator are stand-ins for the General President and GEB, who properly delegated their disciplinary power to those Court Officers pursuant to Article XXVI, section 2 of the IBT Constitution. *United States v. International Brotherhood of Teamsters*, 931 F.2d 177, 184 (2d Cir.1991); *United States v. International Brotherhood of Teamsters*, 905 F.2d 610, 622 (2nd Cir.1990); May 6, 1991 Opinion & Order, 764 F.Supp. 787, 789 (S.D.N.Y.1991); December 27, 1990 Opinion & Order, 754 F.Supp. 333, 337 (S.D.N.Y.1990); September 18, 1990 Opinion & Order, 745 F.Supp. 189, 191–92 (S.D.N.Y.1990); August 27, 1990 Opinion & Order, 745 F.Supp. 908, 911 (S.D.N.Y.1990); March 13, 1990 Opinion & Order, 743 F.Supp. 155, 159–60, *aff'd* 905 F.2d 610, 622 (2nd Cir.1990); January 17, 1990 Opinion & Order, 728 F.Supp. 1032, 1048–57, *aff'd* 907 F.2d 277 (2d Cir.1990); November 2, 1989 Memorandum & Order, 725 F.Supp. 162, 169 (S.D.N.Y.1989); *Joint Council 73, et al. v. Carberry, et al.*, 741 F.Supp. 491, 493 (S.D.N.Y.1990); *Local 27 v. Carberry, et al.*, July 20, 1990 at 3–4, 1990 WL 108348 (S.D.N.Y.1990). Hearings before the Independent Administrator are conducted pursuant to the same standards applicable to labor arbitration hearings. Consent Decree, ¶ F.12.(A)(ii)(e).

Paragraph F.12.(C) of the Consent Decree mandates that the Independent Administrator must decide disciplinary hearings using a "just cause" standard. Consent Decree at 9. This Court should overturn the findings of the Independent Administrator when it finds that they are, on the basis of all the evidence, "arbitrary or capricious." This Court and the Court of Appeals have interpreted ¶ K.16 to mean that decisions of the Independent Administrator "are entitled to great deference." 905 F.2d at 616 (2d Cir.1990) *aff'g* March 13, 1990 Opinion and Order, 743 F.Supp. 155 (S.D.N.Y.1990).

Since Cozza does not demonstrate that any of the Independent Administrator's determinations are arbitrary or capricious, his opinion and supplemental opinion must be affirmed in all respects.

## II. *Discussion*

### A. Discovery

 Cozza's argument that the Independent Administrator violated the Consent Decree by refusing to grant him pre-hearing discovery is meritless. Paragraph F.12.(C) of the Consent Decree, which governs disciplinary hearings, does not give an IBT member against whom disciplinary charges have been filed any right of pre-hearing discovery. Cozza was not prejudiced by the conduct of the hearing. After the completion of the Investigation Officer's case against Cozza, he was granted a 19 day recess to consider all of the evidence and present his defense. Cozza claim that he was denied an opportunity to review the proof against him before putting on his defense absolutely belies all the facts before the Independent Administrator and this Court.

The Court finds his argument facetious, empty of any merit whatsoever, and is rejected.

### B. Specificity of Charges

 Cozza argues the charge against him was not adequately specific. A review of prior decisions and the charge demonstrates this is not so. The charge against Cozza listed the individuals that he was alleged to have associated with, and the time span for those associations. This Court has upheld virtually identical charges filed by the Investigations Officer against IBT members. August 27, 1990 Opinion & Order, 745 F.Supp. 908 (S.D.N.Y. 1990); September 18, 1990 Opinion & Order, 745 F.Supp. 189 (S.D.N.Y.1990). The charge against Cozza was a plain, concise statement of the essential facts constituting the offense charged.

Cozza's argument is rejected.

### C. Constitutional Challenges

Cozza further argues that the charge violates (i) his first amendment right of freedom of association, and (ii) his fifth amendment right to due process. These

arguments are specious considering that the exact same contentions have already been rejected by this Court and demonstrate a flawed understanding of first and fifth amendment rights in the context of the mandates of this Consent Decree and the IBT constitution.

■ Cozza asserts that to be disciplined for associating with known organized crime figures violates his first amendment freedom of association rights. This Court has specifically rejected that argument. August 27, 1990 Opinion & Order, *supra*, 745 F.Supp. at 913. This Court held that:

> The Independent Administrator has determined that the IBT has the right to discipline members for knowingly associating with organized crime figures since it has a compelling institutional interest in ridding itself of corruption. The IBT's sanctioning itself in order to rid itself of corrupt influence conforms with § 101(a)(2) of the LMRDA, and infringes no First Amendment rights.

*Id.* Cozza does even not attempt to address this holding. Further, Cozza is being disciplined by the Independent Administrator as a stand in for the IBT General President. He does not establish the state action necessary for a constitutional claim.

■ Cozza's fifth amendment due process argument ignores established precedent and is fanciful. Cozza argues that current punishment for past conduct violates his rights. He claims he was never notified that associating with organized crime figures could subject him to discipline. That very same argument was previously raised and rejected by this Court in its August 27, 1990 Opinion and Order, *supra*, 745 F.Supp. at 913–14.

Relatedly, Cozza also argues that these charges are unfair. He contends that the Government assured him in negotiating the Consent Decree that the ¶ E.10 injunction against associating with organized crime figures would apply to prospective conduct. This argument is irrelevant, since Cozza was charged with violating his IBT oath of office, not ¶ E.10 of the Consent Decree.

This Court has specifically held that IBT members may be disciplined for associating with organized crime figures which occurred prior to the signing of the Consent Decree. In rejecting an identical challenge, this Court held "[by such conduct they] ignore[ ] their avowed duties as IBT officers to remain free of corrupt influence." *Id.* at 914. Cozza, as an International Vice President and member of the GEB, was under the highest duty to remain free of any taint or appearance of corruption. This Court has previously held that during the time in question Cozza clearly knew or should have known that close contact with organized crime figures was in contravention of his duty to the membership as a union officer. *Id.* Paragraph E.10 of the Consent Decree is not relevant to these charges.

Cozza's arguments are without merit.

### D. Cozza's Knowledge

■ Cozza argues that he did not *knowingly* associate with organized crime figures because he was unaware that the five individuals were members of the Pittsburgh La Cosa Nostra. This argument does violence to the truth and offends reason. Counsel for Cozza admitted that "Cozza knew of the *allegations* against these individuals, as did many members of Cozza's local union and the public at large," but argues that Cozza did not have conclusive knowledge of their criminal conduct.

The Independent Administrator considered Cozza's admitted personal contact with these five individuals, including visiting with LaRocca on almost a daily basis, and concluded "it is inconceivable that he [Cozza] was unaware that they were infamous members of Pittsburgh's underworld ... I conclude that such knowledge may be inferred from the duration and quality of the association." *Appendix* at 811–12.

Cozza is challenging the Independent Administrator's determination of his knowledge and intent. The trier of fact must infer knowledge and intent by considering the facts and circumstances, including the individual's acts and words, and then draw rational inferences from those facts and

circumstances. As the trier of fact, the Independent Administrator considered the unrefuted evidence which demonstrated that Cozza was a close associate of all five of these individuals, including a daily visitor with LaRocca, that Cozza knew that the five individuals were members of La Cosa Nostra, and drew the reasonable inference of Cozza's knowledge. Cozza has not identified any evidence either ignored or overlooked by the Independent Administrator. The Independent Administrator findings were neither arbitrary nor capricious.

### E. The Section 3(d) Defense

■ Finally, Cozza argues that the Independent Administrator erred by rejecting his contention that Article II, § 3(d) ("§ 3(d)") of the IBT constitution, reproduced below, bars this charge.[1] This reasoning is baseless.

Judicial interpretation of § 3(d) has established that to invoke this defense, a member must demonstrate "that the membership ... had conclusive knowledge that the defendants were actually guilty of the conduct when they were" elected to their current term of office. March 13, 1990 Opinion & Order, 743 F.Supp. 155, 166 (S.D. N.Y.) *aff'd* 905 F.2d 610 (2d Cir.1990). Section 3(d) cannot be used when the charged member denies the conduct. *Id.;* November 2, 1989 Memorandum & Order, 725 F.Supp. 162, 165 (S.D.N.Y.1989), *aff'd* 905 F.2d 610 (2d Cir.1990).

Cozza is legally barred from invoking § 3(d). Cozza denies that he knowingly associated with organized crime figures: He still maintains that he did not know that the five individuals were members of La Cosa Nostra. Accordingly, Cozza cannot avail himself of the § 3(d) defense since, as the Independent Administrator found, "it would be impossible for the Local 211 rank and file to be generally aware that Cozza was 'knowingly associating' with underworld figures, when Cozza himself denies that he knew of their underworld ties."

---

1. Section 3(d) provides in pertinent part:
Charges against elective officer of the International Union or any subordinate body shall be limited only to those activities or actions occurring during their current term of office, and

*Appendix* at 813. As a result, the questionnaires Cozza presented to the Independent Administrator which purportedly demonstrated that the membership "knew generally" of his conduct is no more real than a mirage.

Nor should I overlook that Cozza has not even argued that the membership of the Eastern Conference of Teamsters, or the GEB as the representative of the entire IBT, knew generally of his conduct. Since he was an officer of both, he must demonstrate that all members of those bodies knew generally of his conduct to avail himself of the § 3(d) defense.

Cozza's argument is meritless and must be rejected.

### III. Conclusion

IT IS HEREBY ORDERED that Cozza's objections to the opinion and supplemental opinion are hereby denied.

IT IS HEREBY ORDERED that the opinion and supplemental opinion of the Independent Administrator are affirmed in all respects.

IT IS FURTHER ORDERED that the stay on the penalties imposed by the Independent Administrator is dissolved, effective immediately.

So Ordered.

### APPENDIX

INVESTIGATIONS OFFICER, Claimant,

v.

THEODORE R. COZZA, Respondent.

### OPINION OF THE INDEPENDENT ADMINISTRATOR

A charge having been filed by the Investigations Officer, Charles M. Carberry, against Theodore R. Cozza ("Cozza"), a hearing was held on July 14 and August 2–3, 1990. Thereafter, I kept the record open until September 11, 1990, to permit Cozza's counsel to supplement the record. Cozza was represented throughout by Jo-

---

only those activities and actions occurring prior to their current term which were not then known generally by the membership of the International Union or the subordinate body in the case of an officer of a subordinate body.

seph J. Pass, Esq. Post-hearing submissions were received from Cozza and the Investigations Officer.

Cozza has been the President of Local 211 in Pittsburgh, Pennsylvania since 1950. He also serves as Chairman and Trustee for each of the funds operated by Local 211, including the Pension Fund, the Employee Welfare Fund, and the Prepaid Legal Service Fund. He is, as well, the Secretary–Treasurer of the Policy Committee of the Eastern Conference of Teamsters. Lastly, Cozza sits on the IBT General Executive Board as the Ninth Vice–President.

Cozza was named as a defendant in the Government's underlying civil RICO suit against the International Brotherhood of Teamsters ("IBT") (*United States v. IBT, et al.*, 88 Civ. 4486 (DNE)); and he was also a signatory to the March 14, 1989, Consent Order that settled that suit.

## I. The Charge

The Investigations Officer charges that Cozza has violated Article II, Section 2(a) [1] of the IBT Constitution:

By conducting [himself] in a manner to bring reproach upon the [IBT], to wit: By [his] knowingly associating from, at least, January 1, 1970 to the present with members of organized crime families of La Cosa Nostra including John S. LaRocca, Gabriel "Kelly" Mannerino, Michael Genovese, Joseph "JoJo" Pecora, Antonio Ripepi and Joseph Sica.

## II. Cozza's General Defenses

A. The Objection To The Specificity Of The Charge And The Pre–Hearing Discovery Issue

Cozza challenges the charge filed by the Investigations Officer as falling short of

the Consent Order's requirement of "written specific charges." Cozza also claims the charge is not specific enough under federal law. Cozza also takes exception to the fact that he was not supplied with pre-hearing discovery. Cozza Post-hearing Memorandum at pp. 47–57. Pre-hearing memoranda were submitted on this very issue. On November 30, 1989, I wrote to Cozza's counsel stating that, "given the nature of these charges, I hold that there is no right to pretrial discovery in this matter. Thus, your request for information from Mr. Carberry regarding the 'specificity' of the charges against Cozza is denied."

In addition, Cozza made similar claims before the Honorable David N. Edelstein prior to the commencement of his hearing. Judge Edelstein rejected these claims, first at a pretrial conference on a complaint Cozza had filed against me (March 8, 1990), then again in rejecting Cozza's request for an injunction preventing his disciplinary hearing from going forward. In denying the injunction, Judge Edelstein specifically directed Cozza to bring to him any claims he might have after I issued my decision on the merits. *Cozza v. Lacey, et al.*, 740 F.Supp. 285 (S.D.N.Y.1990).[2]

Moreover, it has been the Investigation Officer's practice to provide a respondent, prior to the commencement of a hearing, with the evidence that will be offered against him. This was done in this case. On or about July 10, 1990, the Investigations Officer began supplying Cozza with his evidence. The last of the evidence was supplied on July 13, 1990, the day before the hearing commenced. Thereafter the hearing did not reconvene for some 19

---

**1.** Article II, Section 2(a) of the IBT Constitution provides:

Any person shall be eligible to membership in this organization upon compliance with the requirements of this Constitution and the rulings of the General Executive Board. Each person upon becoming a member thereby pledges his honor: to faithfully observe the Constitution and laws of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and the

By-laws and laws of his Local Union; to faithfully perform all the duties assigned to him to the best of his ability and skill; *to conduct himself or herself at all times in such a manner as not to bring reproach upon the Union....* [emphasis supplied]

**2.** The Government's motion for sanctions pursuant to Federal R.Civ.P. 11 against Cozza and his counsel arising out of this preliminary injunction motion is *sub judice*.

days. This gave Cozza's counsel ample time to review and understand the Investigations Officer's evidence.

In addition, the charge itself was specific. It named the six individuals with whom Cozza had allegedly associated. It stated the date the associations commenced. It also noted that Cozza's relationship with the named organized crime members was continuing to the day of the filing of the charge.

Still further, the prohibition against "knowingly associating" with organized crime figures is not vague. Cozza apparently understood the term when he signed the Consent Order which specifically enjoined him from "knowingly associating with any member or associate" of organized crime. Moreover, in my July 12, 1990, decision in the matter of *Investigations Officer v. Senese, et al. aff'd, United States v. IBT*, (Application XII), 745 F.Supp. 908 (S.D.N.Y.1990), I clearly set forth the Investigations Officer's burden on such a charge. *Id.* at pp. 35–37. *See also* p. 812, *infra.* Cozza was quite familiar with that matter as he devoted four pages of his post-hearing submission in attempting to distinguish the *Senese* case. He also devoted an additional four pages attempting to distinguish another "knowingly associating" case decided by me, *Investigations Officer v. Salerno, et al.*, Opinion of the Independent Administrator, August 20, 1990, *aff'd, United States v. IBT* (Application XIII), 745 F.Supp. 189 (S.D.N.Y.1990).

Most significantly, Judge Edelstein has already found such charges to be specific and well within the requirements of the Labor Management Reporting And Disclosure Act (29 U.S.C. § 411), the IBT Constitution and the Consent Order. *United States v. IBT*, 743 F.Supp. 155 (S.D.N.Y.), *aff'd*, 905 F.2d 610 (2d Cir.1990).

In sum, Cozza's claims of prejudice due to lack of specification and lack of pre-hearing discovery are without merit.

### B. Cozza's Lack Of Notice Claim

Cozza argues that the charge must be dismissed because he was never put on notice that his actions would bring reproach upon the IBT. Cozza Post-hearing Memorandum at pp. 58–64. Cozza contends that until the Consent Order's permanent injunction against further association with La Cosa Nostra was entered, he lacked notice that he should not engage in such associations. This identical argument has already been rejected by me in my July 12, 1990, Opinion (pp. 11–13) in the *Senese* matter.

In advancing this argument Cozza adds a new twist. Cozza reviews the evolution of the IBT Constitution, arguing that "the conduct challenged herein was not subject to discipline in the 1970's, so that there was no notice to Cozza or other IBT members." Cozza Post-hearing Memorandum at p. 59. Cozza states that the conduct was "prohibited under the 1957 IBT Constitution, was removed in 1961, and did not reappear until the Consent Order's permanent injunction in 1989." *Ibid.* As stated by Cozza:

> Even more telling proof was the Government's civil RICO suit, brought in an attempt to correct the asserted failure of the IBT to enforce disciplinary measures in the past. [*Ibid.*]

Cozza also asserts, through the testimony of Robert Baptiste, Esq. (one of the attorneys who negotiated the Consent Order with the Government on behalf of several individual defendants) that in negotiating the injunctive provisions of the Consent Order regarding association with La Cosa Nostra "the parties understood it to be prospective." *Id.* at p. 60.

Cozza's reliance on the development of the IBT Constitution does not alter the fact that a union officer's association with organized crime figures on its face brings reproach upon his union, whether or not the IBT Constitution once contained a specific prohibition of such association.

As for the injunction against such conduct found in the Consent Order, I agree that that prohibition is prospective. If Cozza breaches that agreement, he is subject to appropriate action by the Government,

including, but not limited to, contempt proceedings. Cozza, however is not excused from his previous "knowing association" misconduct by promising not to repeat it in the future. Although Cozza argues that such was the intent of the parties, there is nothing within the four corners of the Consent Order that suggest this. *See Security and Exchange Commission v. Levine*, 881 F.2d 1165, 1179 (2d Cir.1989).

### C. Cozza's Statute Of Limitations And Laches Argument

Cozza suggests that the Investigations Officer is restricted to the Pennsylvania two-year personal injury statute in bringing the instant charge. Cozza Post-hearing Memorandum at p. 61, *citing Reed v. United Transportation Union*, 488 U.S. 319, 109 S.Ct. 621, 102 L.Ed.2d 665, 676 (1989). Cozza also suggests, apparently in the alternative, that the IBT's one year statute of limitations is applicable. *Ibid, citing* IBT Constitution Article XIX, Section 6(a).

It is now well settled that the Investigations Officer and the Independent Administrator are not limited by any period of limitation. *United States v. IBT*, (Application III), 725 F.Supp. 162, 166–167 (S.D.N. Y.), *aff'd*, 905 F.2d 610 (2d Cir.1990). Cozza's reliance on *Reed* is misplaced. *Reed* stands for the proposition that a union member's claim under 29 U.S.C. § 411(a)(2), that a union violated his right to free speech as to union matters, is governed by state general or residual personal injury statutes of limitation in the absence of a federal statute of limitation expressly applicable to such claims. As this matter does not involve a union member's claim under 29 U.S.C. § 411(a)(2), *Reed* has no applicability. Moreover, the *Reed* Court recognized that a state statute of limitations would not be applicable if it would "frustrate or significantly interfere" with federal policies. Certainly, any adherence to the Pennsylvania two-year personal injury statute of limitations in an attempt to bar the instant charge would "frustrate and significantly interfere" with the policy underlying the authority of the Investigations Officer and the Independent Administrator. As was stated in my September 29, 1989, decision in the matter of *Investigations Officer v. Friedman, et al.* at p. 8, "if the authority granted the Investigations Officer and the Independent Administrator is to have any impact, they must be given the opportunity to probe the history of the IBT and particular members and officers involved," *aff'd, United States v. IBT* (App. III), 725 F.Supp. 162, 166–167 (S.D.N. Y.1989), *aff'd*, 905 F.2d 610 (2d Cir.1990). Following the same rationale, Cozza's laches argument must be dismissed.

### D. Cozza's First Amendment Argument

Cozza argues, at pp. 64–65 of his Post-hearing Memorandum, that he has a First Amendment right to associate, while a union officer, with members of La Cosa Nostra. Following a comprehensive review of the law on this very issue in my July 12, 1990, Opinion in *Investigations Officer v. Senese*, I rejected such a notion. Judge Edelstein affirmed my conclusion in *United States v. IBT*, (App. XII), 745 F.Supp. 908 (S.D.N.Y.1990).

### III. The Investigations Officer's Case— The Duffy Affidavit

The Investigations Officer's case rested primarily on an Affidavit of Federal Bureau of Investigation ("FBI") Special Agent Charles J. Duffy ("Duffy"). Investigations Officer's Ex. 1 ("Duffy Affidavit"), which was submitted in lieu of his direct testimony. The Duffy Affidavit was supplemented by his testimony on cross-examination. The balance of the Investigations Officer's case consisted primarily of numerous exhibits.

Duffy has been a Special Agent with the FBI for over 19 years. Duffy Affidavit at ¶ 1. He is currently assigned to the FBI's Pittsburgh office. *Ibid*. From 1975 to 1984, and then again from 1988 to the present, Duffy has been primarily involved in the investigation of organized crime and La Cosa Nostra. *Id.* at ¶ 2. From 1984 to 1985, Duffy was assigned to the FBI's Honolulu office where he was again primarily involved in the investigation of orga-

nized crime. *Ibid.* In his work in the FBI's Pittsburgh office, Duffy has been involved in numerous criminal investigations concerning a wide range of criminal activities involving La Cosa Nostra members and associates, primarily concerning the Pittsburgh family of La Cosa Nostra. *Ibid.* Duffy is also fully knowledgeable about the various investigative techniques used by the FBI in organized crime investigations. *Ibid.* During his 15 years of investigating organized crime, Duffy has interviewed, met, observed, overheard, and conducted surveillances of and arrested numerous members and associates of organized crime. *Ibid.* Duffy has also testified in the past in criminal prosecutions involving La Cosa Nostra members and associates.

While Cozza challenged the factual assertions made by Duffy in his Affidavit, no challenge was made to Duffy's credentials. Given Duffy's extensive background and experience, I accept him as an expert knowledgeable in the investigation into organized crime and the structure of organized crime in the Pittsburgh and Western Pennsylvania area.

### IV. The Organized Crime Connections Of Cozza's Alleged Associates

As stated at the outset, the Investigations Officer here alleges that Cozza has associated with six members of "organized crime families of La Cosa Nostra ... John S. LaRocca, Gabriel 'Kelly' Mannerino, Michael Genovese, Joseph 'JoJo' Pecora, Antonio Ripepi and Joseph Sica."

### A. John J. LaRocca

Duffy identified LaRocca as the "Boss" of the Pittsburgh Family of La Cosa Nostra "from at least 1956 until his death in 1984." *Id.* at ¶ 32. Given Duffy's expert knowledge of organized crime in Pittsburgh, I accept this identification. Moreover, LaRocca's organized crime ties are evidenced by many other factors.

In 1957, LaRocca attended a meeting of numerous high-ranking members of La Cosa Nostra at Apalachin, New York.

*Ibid. See also* Ex. A to the Duffy Affidavit. LaRocca also met with organized crime members and associates at a car wash he owned in Pittsburgh, on a regular basis. *Id.* at ¶ 33. The Pennsylvania Crime Commission issued regular reports in the years 1980, 1983 and 1985, which listed LaRocca as a member of the Pittsburgh Family of La Cosa Nostra. *Id.* at ¶ 34. *See also* Exs. B, C, and D to the Duffy Affidavit.

The Investigations Officer also introduced an excerpt of a conversation which was electronically intercepted pursuant to Court Order by the organized crime task force of the State of New York on July 22, 1983. That intercept captured a conversation between the "Boss" of the Lucchese organized crime family (Antonio Corallo) and a member of that family (Salvatore Avellino). The two were discussing a newspaper article which had reported on the LaRocca family's involvement in unlawful activities, such as bookmaking, in Atlantic City. Corallo indicated that the report might be accurate and he stated he knew and liked "LaRocca." *Id.* at ¶ 35. *See also* Ex. E to the Duffy Affidavit. Duffy understood Corallo's statement regarding "LaRocca" to refer to John J. LaRocca.

Duffy also referred to excerpts from a transcript of deposition testimony of Angelo Lonardo given on September 14, 1989, (Ex. H to the Duffy Affidavit) and an excerpt from an official report of an interview conducted of Lonardo by a Special Agent of the FBI on October 31, 1983 (Ex. I to the Duffy Affidavit). Lonardo is an admitted former "Underboss" of the Cleveland Family of La Cosa Nostra. He is currently a federally protected witness. In the excerpts highlighted by Duffy, Lonardo stated that LaRocca had been the Boss of the LCN Pittsburgh Family. *Id.* at ¶ 38. Lonardo also testified that LaRocca, as Boss of the Pittsburgh Family, worked with the Cleveland organized crime family and its boss, in connection with criminal activities in Ohio. *Id.* at ¶ 40.

I find the evidence in the Duffy Affidavit to be credible and, noting it was not refut-

ed by any evidence from Cozza, hold that it establishes that LaRocca was a member and the one time "Boss" of the LCN Pittsburgh Family.

## B. Gabriel "Kelly" Mannerino

Through the Duffy Affidavit, many pieces of evidence were introduced which supported the conclusion that Gabriel "Kelly" Mannerino was a member of the LCN Pittsburgh Family.

Mannerino accompanied LaRocca to the Apalachin meeting in 1957. *Id.* at ¶ 32. *See also* Ex. A to the Duffy Affidavit. The three Pennsylvania Crime Commission Reports listed Mannerino as a member of the Pittsburgh Family. *Id.* at ¶ 34. *See also* Exs. B, C, and D to the Duffy Affidavit.

In the above-mentioned July 22, 1983, electronic surveillance Corallo speaks of a "Kelly" and his brother "Sammy" and mentions that both had since died. *Id.* at ¶ 35. *See also* Ex. E to the Duffy Affidavit. I accept Duffy's understanding that these statements refer to Gabriel "Kelly" Mannerino and his brother Sammy Mannerino. Both were dead at the time Corallo made these statements. Duffy also interpreted Corallo's statements to mean that Kelly was at one time active in the LCN Pittsburgh Family. Again, given Duffy's expert knowledge, I accept his interpretation of this intercept.

Duffy further identifies Mannerino as the one time "Underboss" of the LCN Pittsburgh Family. *Id.* at ¶ 42. This is corroborated by Lonardo. *Id.* at ¶ 38. *See also* Exs. H and I of the Duffy Affidavit. The late Jackie Presser, the former IBT General President and FBI informant, also corroborated the identification of Mannerino as the one time "Underboss" in information supplied to the FBI. *Id.* at ¶ 48. *See also* Ex. O to the Duffy Affidavit.

I find this evidence credible and find that the Investigations Officer has established that Mannerino was a member of the LCN Pittsburgh Family and its one time "Underboss."

## C. Michael Genovese

Duffy also tagged Michael Genovese as a long time member of the LCN Pittsburgh Family, and the individual who succeeded LaRocca as that Family's "Boss." *Id.* at ¶ 44. Duffy also stated that Genovese had previously served as the Consiglieri and a Capo in the LCN Pittsburgh Family. *Ibid.* *See also* Ex. D to the Duffy Affidavit.

Like Mannerino, Genovese also accompanied LaRocca to the Apalachin, New York meeting in 1957. *Id.* at ¶ 32. *See also* Ex. A to the Duffy Affidavit. The three Pennsylvania Crime Commission Reports also list Genovese as a member of the LCN Pittsburgh Family. *Id.* at ¶ 34. *See also,* Exs. B, C, and D to the Duffy Affidavit.

Again, I credit Duffy's averments and find that the Investigations Officer has established Genovese's organized crime ties.

## D. Joseph "JoJo" Pecora

Duffy states that Pecora had been a member of the LCN Pittsburgh Family since at least 1960 (*Id.* at ¶ 42) and the aforementioned Pennsylvania Crime Commission Reports list him as a member of the Pittsburgh Family. Again, I find that the Investigations Officer has established his claim that Pecora was a member of organized crime.

## E. Antonio Ripepi

The only items of evidence connecting Ripepi with organized crime are the Pennsylvania Crime Commission Reports which list him as a member of the Pittsburgh Family. However, Duffy does not describe him as an organized crime member. Thus, I do not accept the conclusion of the Investigations Officer that Ripepi is a member of organized crime.

## F. Joseph Sica

Sica is also included in the Pennsylvania Crime Commission lists of LCN Pittsburgh Family members. Duffy corroborates this, describing Sica as a "longtime member" of the Pittsburgh Family. *Id.* at ¶ 43. As with Pecora, Duffy's description of Sica coupled with the Pennsylvania Crime Com-

mission Reports leads me to find that Sica is a member of the LCN Pittsburgh Family.

### V. Cozza's Challenge To The Investigations Officer's Proof

Cozza did not offer any evidence to refute the Investigations Officer's evidence going to the above individuals' organized crime memberships. Notwithstanding this, and although I have already accepted as well founded the finding of the organized crime connections of LaRocca, Mannerino, Genovese, and Pecora and Sica, brief comment is warranted on Cozza's arguments in this regard.

First, Cozza attacks the Pennsylvania Crime Commission Reports as "inherently unreliable as indicators of the results of any evenhanded investigation." Cozza Post-hearing Memorandum at p. 31. The short answer is that I have only accepted these Reports when they have been supported by corroborating proof, e.g., Duffy's expertise and his averments. In the case of Ripepi, I rejected the Investigations Officer's assertion of his organized crime association when presented only with the Crime Commission Reports.

Cozza also suggests that I should reject Presser's and Lonardo's statements as unreliable hearsay. I disagree. In Presser's and Lonardo's description of Mannerino as an underworld figure, they not only corroborated each other, but were also corroborated by other items of evidence: Duffy's expert conclusion; Mannerino accompanying LaRocca to the Apalachin meeting; the Crime Commission Reports listing of Mannerino as a member of the Pittsburgh Family; and the July 22, 1983, intercepts.

Cozza also attacks Duffy's reliance on Pecora's 1979 conviction for "conspiracy to violate [RICO]" and Sica's 1978 conviction for extortion. Having found no connection between these convictions and any organized crime ties, I did not rely on them in reaching my conclusions regarding their underworld status.

Cozza also complains that, unlike Pecora and Sica, there is no evidence that La-Rocca, Mannerino, or Genovese was ever connected with any criminal activity. I find that this does nothing to weaken the conclusion I have reached about their organized crime ties.

### VI. Cozza's Relationships With His Associates

#### A. The Investigations Officer's Proof

Cozza concedes, as he must given the evidence, that he associated with LaRocca, Mannerino, Genovese, Pecora and Sica. As stated by Cozza, "[t]he Investigations Officer has proven association...." Cozza Post-hearing Memorandum at p. 42. In fact, as discussed, in greater detail at pp. 813–15, infra, the thrust of Cozza's defense to this charge is his reliance on Article XIX, Section 3(d) of the IBT Constitution, as he argues that his associations with LaRocca, Mannerino, Genovese, Pecora and Sica were "known generally" to the members of his Local. Notwithstanding Cozza's candid admission of these associations, a review is warranted of the Investigations Officer's proof thereof.

#### 1. LaRocca

Exhibit M to the Duffy Affidavit consists of copies of FBI reports concerning surveillances conducted between September 10, 1975, and October 14, 1975, at LaRocca's car wash in Pittsburgh, Pennsylvania. See Duffy Affidavit at ¶ 46. Several observations of Cozza and/or his automobile, a 1974 Cadillac sedan registered to IBT Local 211, were made during these surveillances. Id.

Exhibit N to the Duffy Affidavit is a composite of excerpts of videotapes made by the FBI during these surveillances. In his affidavit, Duffy describes these surveillances. During the hearing, I also viewed the videotapes. On one of those days, September 16, 1975, Cozza arrived at the car wash at 12:24 p.m. He had his car washed. At 1:31 p.m., he drove away from the car wash. At 8:27 p.m., Cozza was observed returning to the car wash with LaRocca, Pecora, Mannerino and Sica in Cozza's car. The fact that Cozza frequented the car

wash was corroborated by Cozza's own evidence. T130–5 to 23 ("I saw Mr. Cozza and Mr. LaRocca many times at the car wash.");[3] T336–10 to T137–5 (saw Cozza and LaRocca "different times over at the car wash"). One witness testified that he had seen Cozza and LaRocca together on Saturday nights at a restaurant "millions" of times. T341–15 to 20. Cozza was also seen with LaRocca at the loading docks of the Pittsburgh Press. T37–4 to 9. LaRocca has also visited Cozza at the Local Union office. T482–18 to T483–3. Other Local 211 members stated that they had seen Cozza and LaRocca together frequently. *See, e.g.,* Questionnaires[4] of Thomas A. Barone Jr. ("many times"); Paul Cozza ("usually" at the car wash); Raymond F. Morgano ("once or twice a week"); and Richard W. O'Malley ("various occasions").

### 2. Mannerino

Cozza, in a deposition taken by the Investigations Officer, admitted he was a visitor to Mannerino's farm on many occasions during the 1970's. He would visit there with LaRocca spending two or three hours at a time. Investigations Officer Ex. 2 at pp. 196, 201. Cozza also admitted meeting Mannerino accidentally in a Florida restaurant on several occasions. *Id.* at pp. 197–198. Cozza's son, Paul, in one of the post-hearing Questionnaires submitted on behalf of Cozza, acknowledged his father's longstanding and frequent contacts with Mannerino.[5] In fact, a Local 211 member had heard Mannerino describe Cozza as a "good guy" and a "good friend[ ]." T323–12 to T324–5.

Against this background, the information Jackie Presser provided to the FBI on April 15, 1979, although hearsay, is reliable and probative. Presser told the FBI that Mannerino had met with the then IBT General President, Frank Fitzsimmons, to insure

that Fitzsimmons would continue to take care of Cozza since Cozza was a very close associate of Mannerino and was Mannerino's main link to the IBT. *See* Duffy Affidavit at ¶ 48; *see also* Ex. O to the Duffy Affidavit. That Cozza's rise, in the mid to late 1970's, to the ranks of International Office holder coincided with his visits to Mannerino's farm and the reported conversation between Mannerino and Fitzsimmons is significant when judging the reliability of Presser's information. In 1974, after 24 years as Local Union President, Cozza was made an International Organizer. Investigations Officer Ex. 2 at p. 39. Five years later, he became an International Trustee, finding himself on the prestigious IBT General Executive Board. *Id.* at pp. 47–48, 52.

### 3. Genovese

As for Genovese, Cozza testified at his deposition that he saw Genovese occasionally at wakes, weddings and possibly Mannerino's farm. Investigations Officer Ex. 2 at pp. 203–204. Cozza testified that during the 1970's he met Genovese "once, twice, maybe more than that, I don't recall." *Ibid.*

Cozza's dismissive description of his relationship with Genovese is hardly consistent with his greeting Genovese with a kiss when Cozza saw him at a wake of a Pittsburgh organized crime figure in 1987. Ex. R to the Duffy Affidavit. Cozza's own secretary testified that kissing was not Cozza's standard or customary greeting. She explained that when Local members kissed Cozza, they did it as a sign of respect. T474–3 to T475–4. This was supported by the video tapes of Cozza in 1975 at the car wash and at the 1987 wake. Exs. N and R to the Duffy Affidavit. Moreover, at the 1987 wake, Cozza greeted Genovese with a kiss, despite the many

---

**3.** Unless otherwise indicated, transcript references are to the August 2, 1990, proceedings. The first reference, in this case "T130," refers to the page number (p. 130). The second reference, in this case "5 to 23," refers to the line numbers (line 5 to line 23).

**4.** By agreement of counsel, a Questionnaire was prepared and provided to Local 211 members,

to be completed in lieu of live testimony. By letters dated August 31, and September 11, 1990, Cozza's counsel supplied a total of 411 Questionnaires to the Investigations Officer and to me as part of Cozza's case.

**5.** Paul Cozza stated, "I can remember Kelly Mannerino as long as I can remember."

others present including LaRocca's son, who had been a member of Local 211. Duffy Affidavit at ¶¶ 51–52.

Cozza's claim of a few fleeting contacts with Genovese is further refuted by the completed Questionnaires of Local 211 members submitted by Cozza's attorney. These Questionnaires reveal that Cozza has been seen on several occasions in different places with Genovese over a substantial period. *See, e.g.,* Questionnaires of John P. Cangelier, John J. Alioto, Carl H. Morgano, Edward L. Achille, and Carl F. Roberto.

### 4. Pecora

Moving to Pecora, Cozza admitted knowing him. Investigations Officer Ex. 2 at p. 206. As with Genovese, Cozza described Pecora as merely a casual acquaintance. *Ibid.* Pecora asked Cozza on several occasions for help in getting Pecora's brothers jobs with an employer of Local 211 members. According to Cozza, "they applied for jobs and got them, as truck drivers."[6] *Id.* at pp. 206–209.

Although Cozza testified that he had not met with Pecora after his 1979 conviction, a member of Local 211 stated he had seen Cozza with Pecora after that date. T427–11 to T428–3 (saw Cozza and Pecora together at the car wash in the 1980's). Moreover, despite Cozza's claims that he only knew Pecora casually and had not seen him for some eight years, he attended Pecora's funeral in 1987. T89–9 to 12. *See also* Questionnaire of John J. Martino. Cozza's testimony that he never ate meals with Pecora was also refuted by Local 211 members. *See, e.g.,* Questionnaires of Thomas J. Nusser, Carmen Paul Roberto Sr. and Henry F. Lutz.

### 5. Sica

Lastly, we have Joseph Sica. Once again Cozza admitted knowing Sica. Investigations Officer Ex. 2 at p. 220. Once again he claimed to have seen him only at weddings and wakes during the 1970's. *Id.* at p. 221. He also admitted meeting with Sica at LaRocca's car wash. *Id.* at p. 222. Finally, Cozza also concedes that he may have seen Sica at Mannerino's farm during that same time period. *Id.* at p. 223.

### VII. Cozza's Knowledge of His Associates' Organized Crime Ties

Cozza argues that the "Investigations Officer has completely failed to demonstrate Cozza's knowledge of the organized crime status of each individual." Cozza's Reply Memorandum at p. 10. I disagree.

While Cozza, in his deposition testimony, pled ignorance as to the vocations of his organized crime associates,[7] a review of his deposition indicates that he did not present himself as a credible witness. While Cozza downplayed his associations with LaRocca, Mannerino, Genovese, Pecora and Sica, he was effectively contradicted by other proofs—his own admissions; the videotape evidence; the statements of his own Local Union members; and his own son.

Cozza has been a Teamster in Pittsburgh for some 44 years. Cozza Post-hearing Memorandum at p. 2. He has been the president of his Local of 40 years. *Ibid.* Allegations that LaRocca, Genovese, Pecora, Mannerino and Sica were members of organized crime have been wide-spread throughout the Pittsburgh media for some time. Investigations Officer Exs. 3, 4.[8]

---

**6.** I also find it noteworthy that Genovese's son and a relative of LaRocca are listed as active members of Local 211. LaRocca's son was also once a member of Local 211. Duffy Affidavit at ¶ 52.

**7.** For example, Cozza testified that he did not know how Mannerino made a living. Investigations Officer Ex. 2 at p. 196. He also testified that he knew Genovese only as a "used car salesman or something or other." *Id.* at p. 203. Cozza also stated that he only knew that "Pecora

owned a motor home thing down in West Virginia." *Id.* at p. 206.

**8.** Investigations Officer's Ex. 3 included copies of the following articles:
 1. A July 24, 1968, Pittsburgh Post—Gazette article describing the "first major roundup of national crime syndicate members," including LaRocca, Mannerino, and Sica.
 2. A July 3, 1970, Pittsburgh Post—Gazette article with the headline "Mafia Activity In Area Dates Back To 1890's." That article named Sica, Mannerino, LaRocca, and Genovese.

Like much of his other testimony, Cozza's assertion that he only read the Pittsburgh papers occasionally (Investigations Officer Ex. 2 at p. 117) is not credible. As reflected by his admissions that he learned of items of IBT corruption from the newspapers, Cozza was obviously a regular reader of newspapers. *Id.* at pp. 134, 146, 175, 184, 186, and 227. Cozza also testified that he read about Pecora's and Sica's convictions in the papers. *Id.* at pp. 232–234. Moreover, on each of the two days an investigator from the Investigations Office was at Local 211's office, Cozza was reading newspapers. In fact, Cozza asked the investigator if he had noticed an item in the paper. July 14, 1990, Transcript at T130–11 to T131–4. It is also significant that Cozza's Local represents employees from Pittsburgh's main newspapers. Given all the union positions held by him, it is most unlikely that Cozza, a longtime labor leader in Pittsburgh, who represents employees working for Pittsburgh newspapers, would not keep abreast of Pittsburgh affairs and that it would never come to his attention that the people named herein were said to be involved with organized crime. In fact, Cozza's attorney apparently agrees with this conclusion when he states "Cozza knew of the *allegations* against these individuals, as did many members of Cozza's local union and the public at large." Cozza Reply Memorandum at p. 11 (emphasis in original).

The point that Cozza misses in this regard is that while many members of his Local and the public at large may have read the same allegations regarding involvement in organized crime of Cozza's associates, the evidence against Cozza goes beyond this. It was Cozza who had personal access to these men. After all, it was Cozza who visited with LaRocca on almost a daily basis; it was Cozza who frequently visited Mannerino at his farm; it was Cozza whom Mannerino described as a "good guy" and a "good friend[ ];" it was Cozza who felt sufficiently intimate with Genovese to greet him with a kiss; it was Cozza who felt close enough with Pecora to attend his funeral; and, it was Cozza who would meet Sica at LaRocca's car wash and at Mannerino's farm. In short, given Cozza's long standing relationships with these men, it is inconceivable that he was unaware that they were infamous members of Pittsburgh's underworld. As stated in my July 12, 1990, Opinion in *Investigations Officer v. Senese*, at p. 37, "In the absence of direct evidence of knowledge of the organized crime ties of an associate, I con-

3. An October 30, 1971, Pittsburgh Post—Gazette article linking Mannerino and LaRocca to La Cosa Nostra and "systematic gambling and corruption of municipal officials." A similar article ran in the Pittsburgh Press the same day.
4. An August 2, 1973, Pittsburgh Post—Gazette article describing La Cosa Nostra's involvement in labor racketeering. The article linked LaRocca to the mafia.
5. A January 29, 1974, Pittsburgh Post—Gazette article identifying Sica as an "underworld lieutenant[ ]." LaRocca is described in the article as the "Pittsburgh Area 'boss.'" Mannerino was described as a "capo."
6. A September 28, 1974, Pittsburgh Post—Gazette article bearing the headline "4 Area Mob Bosses Subpoenaed." Sica, Genovese, and LaRocca are all named in the article.
7. A December 19, 1974, Pittsburgh Post—Gazette article which reported that Genovese had been jailed twice in 1974 for failing to testify before a grand jury. A related December 20, 1974, article was also included in Ex. 3.
8. An August 13, 1975, Pittsburgh Post—Gazette article concerning the immense profitability of the Pittsburgh mob named LaRocca.

9. A December 4, 1984, Pittsburgh Press obituary for John LaRocca containing the headline "Mob Boss John LaRocca Dies." The article also states that LaRocca "often held meetings with his top lieutenants at his North Side business—Allegheny Car Wash at 100 Sandinsky Avenue."
Investigations Officer's Ex. 4 included copies of the following articles:
1. An undated Pittsburgh Press article identifying Pecora as "second in command to the reputed La Cosa Nostra boss, Michael J. Genovese...."
2. A March 8, 1987, Pittsburgh Press article describing Pecora as "the reputed heir apparent to the leadership of the Western Pennsylvania Cosa Nostra."
3. A March 4, 1987, Pittsburgh Press obituary of Pecora again describing him as the "heir-apparent to the leadership of Southwestern Pennsylvania's La Cosa Nostra."
4. A July 5, 1972, Pittsburgh Press and Post—Gazette article that tied LaRocca and his car wash to organized crime.
5. A March 5, 1987, Pittsburgh Post—Gazette article describing Pecora as an "Underboss."

clude that such knowledge may be inferred from the duration and quality of the association."

## VIII. Cozza's "Knowing Association"

Cozza is wrong when he states that he would have to "have known of criminal activity allegedly engaged in by these individuals to justify any sanctions against him." Cozza Reply Memorandum at p. 11. Since Cozza is charged with knowingly associating with members of organized crime, all that must be established by the Investigations Officer to sustain this charge is that Cozza knew them to be members of organized crime. The Investigations Officer need not establish either that Cozza knew of the details of their criminal activities or participated in any of those activities.

In my July 12, 1990, decision at pp. 35–36, in the *Senese* matter, I held that:

[I]n order for the Investigations Officer to sustain his burden of proving a prohibited association with organized crime members, he must show that the contacts in question are purposeful and not incidental or fleeting. Such contacts may be shown in either a business or social context.... In determining whether the Investigations Officer has sustained his burden of proving a prohibited association, the focus will be placed on the nature and not the number of contacts in question.

In this connection, the Investigations Officer has established the following:

1. Cozza was a frequent visitor to La-Rocca's car wash, oftentimes travelling in his Local's automobile.
2. On September 16, 1975, Cozza travelled to the car wash in the evening, in his car, with LaRocca, Pecora, Mannerino and Sica as passengers.
3. Cozza and LaRocca were frequent dinner companions.
4. LaRocca visited Cozza at his Local Union office.
5. Cozza would meet LaRocca on the docks of the Pittsburgh Press.
6. During the 1970's, Cozza visited Mannerino, accompanied by La-Rocca, many times at Mannerino's farm. These visits would last two-three hours.
7. Cozza and Mannerino would meet (accidentally) on several occasions in a Florida restaurant.
8. Mannerino considered Cozza a "good guy" and a "good friend[ ]."
9. Mannerino approached then IBT General President Frank Fitzsimmons to champion Cozza's career. During that conversation, Mannerino described Cozza as his [Mannerino's] main link to the IBT.
10. In addition to other meetings, Cozza would also see Genovese at Mannerino's farm.
11. Cozza greeted Genovese with a kiss at a funeral in 1987. At this time, Genovese was the Boss of the Pittsburgh Family.
12. Cozza met with Pecora before and after 1978.
13. Pecora requested Cozza's help in getting his brothers jobs with employers of Local 211 members and after applying, Pecora's brothers got jobs as truck drivers.
14. Cozza attended Pecora's funeral.
15. Cozza knew Sica and saw him at weddings and wakes.
16. Cozza would see Sica at LaRocca's car wash and Mannerino's farm.

Certainly, there can be no quarrel that Cozza and LaRocca were frequent companions and would visit each other regularly. Their meetings can be described as nothing other than purposeful.

With Mannerino, disregarding the accidental meetings in the Florida restaurant, Cozza often made trips to visit Mannerino at his farm during the 1970's. Again, these are clearly purposeful contacts. During these visits to the farm, Cozza would also see Genovese and Sica there. While no proof was offered that these meetings with Genovese and Sica at Mannerino's farm were preplanned, given the

nature and frequency of the meetings, they cannot be considered as fleeting.

While I do consider Cozza's unspecified contacts with Sica at wakes and weddings as incidental, I do not consider Cozza's 1987 meeting with Genovese at the funeral of an underworld boss as incidental given the manner in which Cozza greeted Genovese—with a kiss.

Cozza also had several meetings with Pecora, at one meeting Pecora asked Cozza for a union-related favor; this resulted in Pecora's brothers getting jobs as truck drivers with employees of Local 211 members. Again these types of meeting are also purposeful.

All five men travelled in the same car together in September of 1975 to LaRocca's car wash. Certainly five grown men in a car, in the evening, is not an incidental or fleeting contact.

In short, the Investigations Officer has satisfied his burden of proving by a preponderance of the evidence that Cozza knowingly associated with LaRocca, Genovese, Mannerino, Pecora, and Sica.

Cozza argues that these associations did not bring reproach upon the IBT, because Cozza's actions did not bring notoriety or negative publicity to the IBT. Cozza Reply Memorandum at p. 19. Cozza misses the point. Simply put, there is no such thing as a purposeful, yet innocent or non-reproachful association of an Union leader and an underworld figure.

## IX. The Section 3(d) Defense

Lastly, Cozza argues that Article XIX, Section 3(d) of the IBT Constitution bars the charge against him. Section 3(d) provides, in pertinent part, as follows:

Charges against elective officers of the International Union or any subordinate body shall be limited only to those activities or actions occurring during their current term of office, and only those activities and actions occurring prior to their current term which were not then known generally by the membership of the International Union or the subordinate

body in the case of an officer of a subordinate body.

It is now settled that a respondent who raises the Section 3(d) defense has the burden of proving "that the membership ... had conclusive knowledge that defendants were actually guilty of the conduct when they were" elected to their current term of office. *United States v. IBT*, 743 F.Supp. 155, 166 (S.D.N.Y.), *aff'd*, 905 F.2d 610 (2d Cir.1990).

In advancing this defense Cozza argues that:

[T]he evidence relied upon by the Investigations Officer demonstrating that Cozza associated with the individuals named in the charge is the same evidence which establishes that the membership of Local 211 knew generally of Cozza's *conduct*, and subsequently reelected him. [Cozza Post-hearing Memorandum at p. 43 (emphasis in original)].

In support of the proposition that the Local 211 membership knew generally of Cozza's underworld associations, Cozza relies on the live testimony of the witnesses at the August 2 hearing and the subsequent submission of the Questionnaires by Local 211 members.

First, it is established that Section 3(d) cannot serve as a shield to a charge where a respondent denies the underlying conduct. *United States v. IBT, supra*, 725 F.Supp. at 165; *United States v. IBT, supra*, 743 F.Supp. at 166. In this case Cozza has denied that he knew that LaRocca, Mannerino, Genovese, Pecora and Sica were members of organized crime. Cozza contends that he only read such allegations in the press and that he had no personal knowledge of their organized crime ties. *See* Cozza Post-hearing Memorandum at pp. 38–39; and Post-hearing Reply Memorandum at pp. 10–18. Given this position, it would be impossible for the Local 211 rank and file to be generally aware that Cozza was "knowingly associating" with underworld figures, when Cozza denies that he himself knew of their underworld ties.

In this connection the testimony and Questionnaires submitted by Cozza in sup-

port of the Section 3(d) defense merely reflects that the Local 211 rank and file only knew of the allegations concerning Cozza's associates.[9] Moreover, whatever the conclusions to be drawn from the testimony and questionnaires of the Local 211 members, they reflect only that a limited number of Local 211 members had some knowledge of Cozza's associations. As pointed out by the Investigations Officer:

Of the ... members who submitted questionnaires only 45 stated they ever saw Cozza with LaRocca. Only three reported seeing Cozza with Mannerino. Only seven saw him with Genovese. Ten members saw him with Pecora and Ripepi and only one member reported seeing Cozza with Joseph Sica. [Investigations Officer Post-hearing Memorandum at p. 21].

It is also significant that Cozza has only sought to prove his Section 3(d) defense as it relates to his Local 211 office. Cozza was elected to his International Vice–President position in 1986. Cozza Post-hearing Memorandum at p. 3. No evidence was offered to show that in 1986 the "membership of the International Union" generally knew Cozza was associating with members of La Cosa Nostra prior to his 1986 election.

Lastly, Section 3(d) only applies to "elective officers." Since Cozza was appointed as the Secretary–Treasurer of the Policy Committee of the Eastern Conference of Teamsters, Section 3(d) has no applicability to that position. Similarly, Cozza has not suggested that he was elected to his positions as Chairman and Trustee for each of the Funds operated by Local 211.

While Cozza asserts that he was elected to the Policy Committee of the Eastern Conference of Teamsters in 1986 (Cozza Post-hearing Memorandum at p. 3), he presented no proof that the membership of the Locals that make up the Policy Committee generally knew of his associations. As

I explained in my December 18, 1990, decision in the matter of *Investigations Officer v. Vitale*, at p. 29:

In determining the applicability of the Section 3(d) defense, it is the general knowledge of the "membership of the International Union or the subordinated body in the case of an officer of a subordinate body" that is relevant.

In the case of a position with the Eastern Conference, it would be the general knowledge of the membership of the Locals that comprise the Eastern Conference that is relevant.

In light of all this, Cozza has failed to carry his Section 3(d) burden.

### X. The Penalty To Be Imposed

Cozza's associations with the underworld are repugnant to a Union committed to cleansing itself of what Judge Edelstein has coined the "hideous influence of organized crime." While the bulk of the Investigations Officer's proof rested on associations that took place in the 1970's, it is clear that Cozza's ties to the five individuals continued into the 1980's.

LaRocca and Cozza were frequent companions. Cozza's union office was open to the likes of LaRocca. Cozza's own son described the tight relationship his father enjoyed with Mannerino. After all, it was Mannerino who paved the way for Cozza's entrance into the International ranks. Genovese initiated enough respect and/or fear in Cozza to cause Cozza to greet him with a kiss. Pecora capitalized off Cozza's union ties to get work for his brothers. Even Sica, perhaps the most removed from Cozza, would be privy to Cozza's audiences with Mannerino, LaRocca, and Genovese at Mannerino's farm and at LaRocca's car wash. In addition, Cozza, on at least one occasion, used his union supplied automobile to chauffeur these men around.

There is only one just and reasonable penalty to be imposed when a Union officer, especially a member of the Internation-

---

**9.** While 345 of the members who answered the Questionnaires did believe that there was "some" basis of truth to the news stories, only three individuals indicated that they had inde-

pendent personal knowledge that any of the named individuals were part of an "organized crime family" and/or the "Mafia" and/or "La Cosa Nostra."

al General Executive Board, sees fit to hobnob with mob bosses and underlings—permanent debarment from the very Union he has tainted. It is only by cleansing the IBT of the likes of Cozza can this Union ever hope to function as a democratic organization where the rank and file are not fearful of what retribution might be visited upon them if they speak their minds.

While I am not unmindful of the many Local 211 members who exalted Cozza in their testimony and questionnaires, I am confident that an equally qualified union leader, free from organized crime's reach, can be found to fill the vacancy created by Cozza's ouster.

By virtue of this decision, Cozza is permanently barred from the IBT. Thus, Cozza is to remove himself from all of his IBT-affiliated Union positions. (including membership in the IBT) and draw no money or compensation therefrom, or from any other IBT-affiliated source. I will stay this decision and the penalty imposed pending Judge Edelstein's review of my decision, which will be submitted to him for consideration by way of Application.

The only matter left to be considered is whether I should impose sanctions impacting upon Cozza's benefits (including pension, health and welfare benefits). *See Investigations Officer v. Senese, et al.*, Supplemental Decision of the Independent Administrator (November 29, 1990), *aff'd, United States v. IBT* (Application XVI), 753 F.Supp. 1181 (S.D.N.Y.1990). In order to give the Investigations Officer, Cozza and the IBT the opportunity to address this subject I will withhold filing this decision until receipt of supplemental submissions and a determination by me with respect thereto. Thereafter, my decision will be filed with Judge Edelstein by way of Application as provided for in the Consent Order.

Accordingly, I direct that Cozza submit to me within fourteen (14) days a schedule of any and all IBT-related benefits to which he is entitled, as well as a brief setting forth his position as to my jurisdiction to either terminate Cozza's access to those benefits or, in the alternative, to prevent further funding of those benefits by IBT-affiliated sources. The Investigations Officer, the IBT if it wishes to respond, and the Government will then have fourteen days to make their submissions. Seven days thereafter Cozza can reply.

In closing I will want to be advised whether Cozza's legal fees in these proceedings have been, or will be, paid by an IBT-affiliated entity, since these may be considered a benefit.

/s/ Frederick B. Lacey
Frederick B. Lacey
Independent Administrator

Dated: January 4, 1991.

## SUPPLEMENTAL OPINION OF THE INDEPENDENT ADMINISTRATOR

On January 4, 1991, I issued a decision in the above captioned matter in which I found that the Investigations Officer had satisfied his just cause burden of proving that Theodore R. Cozza ("Cozza") had brought reproach upon the IBT by "knowingly associating, from at least January 1, 1970, to the present, with members of organized crime families of La Cosa Nostra...." As a penalty I permanently debarred Cozza from the IBT.

I stayed my decision and the penalty imposed pending United States District Court Judge David N. Edelstein's review of my decision, which, I indicated, would be submitted to him for consideration by way of Application. I further recognized that the only matter left to be considered is whether I should impose sanctions impacting upon Cozza's benefits, including pension, health and welfare benefits. I had imposed such sanctions in the matter of *Investigations Officer v. Senese, et al.*, Supplemental Decision of the Independent Administrator (November 29, 1990), *aff'd, United States v. IBT* (Application XVI), 753 F.Supp. 1181 (S.D.N.Y.1990). *See also Investigations Officer v. Salerno, et al.*, Supplemental Decision of the Independent Administrator (January 7, 1991).

Submissions on this issue were received from Cozza, the Investigations Officer, the IBT, and the Government. Having re-

viewed these submissions, the following determination is rendered regarding Cozza's benefits.

Cozza is a participant in the following plans:

A. *The Pension Plans*

1. The Teamster Affiliates Pension Plan;

2. The Retirement and Family Protection Plan For Officers and Employees of the IBT;

3. Teamsters Joint Council Pension Fund;

4. Teamsters Local No. 211 Pension Plan;

5. Pittsburgh Press Teamsters Plan;

B. *Health and Welfare Benefits*

1. Teamsters Local No. 211 Employees Welfare Benefit Plan;

2. Teamsters Local No. 211 Prepaid Legal Services Plan;

3. The Retirement and Family Protection Act.

## A. The Pension Plans

The Investigations Officer does not contest Cozza's receipt of the five pension plans listed above. This is consistent with my decision in *Senese* wherein I concluded that while the Consent Order does not preclude the termination of health, welfare and employee benefit plans, I did not have jurisdiction over benefit plans that are not exclusively controlled by the IBT or an IBT-affiliated entity. Given that such pension plans involve non-IBT trustees and participants, I found that I did not have jurisdiction over such plans and could not require them to discontinue payment of such benefits to Senese. I also recognized the Supreme Court's prohibition on the preclusion of vested pension benefits. *See Guidry v. Sheet Metal Workers National Pension Fund*, 493 U.S. 365, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990). However, in order

to protect the assets of Senese's Local and prevent the Local's association with a member of organized crime (Senese), I directed the Local and any other IBT-affiliated entity that may have contemplated doing so, to discontinue making payment of union funds to any health, welfare, or employee benefit plan on Senese's behalf.

Following the same reasons as adopted in *Senese*,[1] I direct that no further contributions are to be made by the IBT or any IBT-affiliated source on Cozza's behalf to any of these pension plans.[2]

## B. Health And Welfare Benefits

1. Teamster Local No. 211 Employee Welfare Benefit Plan

Cozza acknowledges that Local 211 pay a monthly premium on behalf of Cozza to fund this plan. Cozza further states that these payments are "contingent upon Cozza's continued employment as an officer of Teamsters Local No. 211." So that there is no confusion, I direct that the IBT or any IBT affiliated entity that may contemplate doing so, cease making contributions to this plan. This directive is consistent with the rationale set forth as to the pension plans.

Given Cozza's acknowledgement that funding of this plan is contingent upon Cozza's employment, I am at a loss to understand Cozza's argument that an order directing the Local to cease funding the plan would violate the terms of Local 211's collective bargaining agreement with the Pittsburgh Press. Given my voluntary stay of Cozza's debarment, this order will not take effect until (and if) that stay is lifted by Judge Edelstein. In other words, pursuant to the terms of this order, Local 211 is to cease funding the plan upon the commencement of Cozza's debarment. This, of course, is consistent with the terms of the plan itself.

---

1. While Cozza was not found to have been a member of organized crime, his long history of organized crime affiliations would make it equally egregious for an IBT-affiliated entity to squander its funds on Cozza, especially in light of his permanent banishment from the IBT.

2. In his submission on the benefits issue Cozza represented that no contributions are currently made on his behalf to the IBT or any IBT-affiliate to any of the pension plans set forth.

Cozza's further argument that I do not have jurisdiction over the plan because the Local does not have exclusive control over its administration, ignores my ruling in *Senese,* wherein I recognized that while I cannot order the cessation of vested benefits from "third party plans," I can direct that no further contributions be made from IBT-affiliated sources to such plans.

2. Teamster Local No. 211 Prepaid Legal Services Plan

Funding for this plan by Local 211 is also contingent upon Cozza's continued employment as an officer of that Local. Cozza requests that treatment of this benefit should merely track the determination regarding benefits provided to Cozza through the Local's Employee Welfare Benefit Plan. I agree. Thus, I direct that the IBT or any IBT-affiliated entity that may contemplate doing so, cease making contributions to the Local's Prepaid Legal Services Plan.

3. The Retirement And Family Protection Plan

Life, accidental death, dismemberment, sickness and accident benefits are provided to Cozza through this plan and are funded by the IBT through monthly premium payments. This plan provides for continued coverage to Cozza upon his "retirement" from employment with the IBT. Once again, to protect its assets, I direct the IBT and any affiliated entity that may contemplate doing so, to cease making contributions to this plan. It is worth noting that this directive is consistent with the terms of the plan itself. The plan only requires continued funding upon "retirement." Cozza has not retired from the IBT but rather has been involuntarily and permanently barred from its ranks.

C. *Payment of Cozza's Legal Fees*

Cozza has represented that none of the legal fees in connection with this matter have or will be paid by either the IBT or any IBT-affiliates. Notwithstanding the representation, it must be noted that none

of Cozza's legal fees should be paid by the IBT, Local 211 or any other IBT-affiliated source. Union officials charged with misconduct and found to have committed misconduct, may not have their legal fees paid by the Union. *United States v. Local 1804-1 ILA,* 732 F.Supp. 434, 436–437 (S.D. N.Y.1990).

/s/ Frederick B. Lacey
Frederick B. Lacey
Independent Administrator

Dated: February 22, 1991.